MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

MATTHEW A. LAMBERTI (DCBN 460339)
Assistant United States Attorneys

   150 Almaden Boulevard, Suite 900
   San Jose, California 95113
   Telephone: (408) 535-5061
   Facsimile: (408) 535-5066
   E-Mail:  Matt.Lamberti@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 10-0495 EJD |
| Plaintiff, | **UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE** |
| v. | |
| SHAWN D. HOGAN, | Date: October 30, 2012 |
| Defendant. | Time: 10:00 a.m.<br>Court: Hon. Edward J. Davila |

**TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    I.    THE LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    II.   APPLICATION OF THE LEGAL STANDARD SET FORTH BY THE SUPREME COURT AND NINTH CIRCUIT SHOWS THAT THE DEFENDANT WAS NOT "IN CUSTODY" ON JUNE 18, 2007. . . . . . . . . . . . 8

        A.   EACH OF THE NINE FACTORS SET FORTH BY THE NINTH CIRCUIT IN THIS AREA FAVORS THE UNITED STATES AND, TOGETHER, DEMONSTRATES THAT THE DEFENDANT WAS NOT "IN CUSTODY" ON JUNE 18, 2007. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.   OTHER RELEVANT FACTORS SHOW THAT THE DEFENDANT WAS NOT "IN CUSTODY" ON JUNE 18, 2007. . . . . . . . . . . . . . . . . . 15

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Beckwith v. United States*, 425 U.S. 341 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*California v. Beheler*, 463 U.S. 1121 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,13

*Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Haynes v Washington*, 373 U.S. 503 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Howes v. Fields*, 132 S. Ct. 1181 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8

*Maryland v. Shatzer*, 130 S.Ct. 1213 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Miranda v. Arizona*, 384 U.S. 436 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Oregon v. Mathiason*, 429 U.S. 492 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Orozco v. Texas*, 394 U.S. 324 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Stansbury v. California*, 511 U.S. 318 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7

*United States v. Allen*, 699 F.2d 453, 459 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . 8,11,14

*United States v. Hayden*, 260 F.3d 1062 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Hudgens*, 798 F.2d 1234 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,13

*United States v. Kim*, 292 F.3d 969 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Lee*, 699 F.2d 466 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. McKerlie*, 2011 WL 5191478 (D. Ariz. Oct. 3, 2011). . . . . . . . . . . . . . . . . . . 11

*United States v. Mittel-Carey*, 493 F.3d 36 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Patterson*, 648 F.2d 625, 633 (9th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . 13

## FEDERAL RULE

Fed. R. Crim. P. 41(f)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**INTRODUCTION**

On June 18, 2007, during the execution of a search warrant at his place of business/residence, defendant Shawn D. Hogan–the owner and operator of a multimillion dollar business called Digital Point Solutions ("DPS")–consented to a voluntary interview with two FBI agents in his living room. Before beginning the interview, the agents advised the defendant that he was not being arrested or detained in any way and did not have to speak with them. The agents *only* began the interview after the defendant *specifically* stated that he was willing to talk with them. The resulting conversation was friendly, relaxed, and free-flowing, and the defendant appeared eager to tell his side of the story. The interview then ended with chit-chat about the defendant's cats, new house, and dating life.

During this interview, the defendant admitted to fraudulently obtaining money from eBay through its Affiliate Program by "cookie stuffing." The defendant also signed various consent forms and receipts and escorted agents (driving his own vehicle) to his off-site server facility where he voluntarily provided them with a hard drive.

Starting the day after the interview, the defendant then made *unsolicited* phone calls to the primary interviewing agent and responded to an email from her, supplementing the original interview with additional information. He also met twice with the other interviewing agent, and visited the FBI office in San Diego. In fact, the defendant did not even bother hiring a lawyer to represent him in the matter until almost two years after the interview. Moreover, in 2010, he blogged in detail about the case but neglected to mention anything about being coerced or intimidated by FBI agents three years earlier.

Now, more than five years after the interview, the defendant has filed a motion claiming that nine FBI agents with their "guns drawn" kept him under "physical control" and "constant escort" on June 18, 2007 and then subjected him to a "full-fledged interrogation" with "coercive questioning" in a "police-dominated environment designed to elicit incriminating statements...." Def.'s Br., at 6, 7, 9, 13, and 14. As a result, he asserts that he was "in custody" during the his interview and thus his confession to wire fraud should be suppressed under *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny. The defendant's motion is completely meritless.

**STATEMENT OF FACTS**

On June 18, 2007, FBI agents executed a search warrant at 8465 Regents Road, #448, San Diego California, the address of DPS and also the residence of defendant Shawn D. Hogan. Adams Decl., at ¶ 2; Exhs. 1 and 2.

The location the agents searched was an approximately square apartment with a circular living room, totaling approximately 1,694 square feet. Exh. 3.[1] The apartment had three bedrooms, three bathrooms, a living room, dining room, kitchen, entry, numerous walk-in closets and other closets, a patio, and a storage area. Attached photos from the search show the entry, the living room, and the adjoining dining room. In the photos, the living room appears to have three sofas (and a white dining room chair) arrayed around a glass coffee table. Exh. 4. The dining room table seems to have blueprints on it. Ex. 5. One of the bedrooms has been turned into an office. Exh. 6.

Around 7:03 a.m., FBI agents began execution of the search warrant, knocking at the door, waiting, and then opening the door with a key supplied by a maintenance worker. Exh. 2. A few minutes after entering, the agents had "cleared" the location, locating all people present. The defendant was the only person there. Agents gave a copy of the search warrant to the defendant, and also took photos of the premises. A total of nine agents participated in the search warrant at various times that morning. Two of the agents left after an hour and 20 minutes, and one was only there for about four minutes. The execution of the search warrant took a total of about three hours.

The case agent in the investigation, FBI Special Agent Melanie Adams, was one of the last agents to enter the apartment. Adams Decl, at ¶ 3. Sometime after Special Agents Adams entered, she and FBI Special Agent Todd Walbridge approached the defendant, identified themselves, and told him that FBI agents were executing a search warrant. Special Agent Adams

---

[1] The floor plan provided by Regents Court for Apartment 448 is the C1 plan. Based on the location of the defendant's apartment in the complex and the photos in Exhibit 4, the actual floor plan of Apartment 448 appears to be a mirror image of the one depicted in the exhibit (*e.g.*, as you face the living room in the apartment, the dining room is on the left, not the right).

1    states that she was not wearing an FBI/police jacket or vest when she approached the defendant.
2    Moreover, according to Special Agent Adams, at no point in her interactions with the defendant,
3    did she draw her weapon or expose it to him.
4          Special Agent Adams and Special Agent Walbridge encountered the defendant in his
5    living room. *Id.* The agents told the defendant that he was not under arrest or being detained in
6    any way. Special Agent Adams advised the defendant that she would like to talk to him but that
7    he was not obligated to talk to them. The defendant indicated that he would like to speak with
8    them.
9          During the interview, the two agents and the defendant were all sitting down in the living
10   room, except when Special Agent Walbridge stood up a few times to deal with administrative
11   matters involving the search. *Id.*, at ¶ 3-4; Exh. 4. Special Agent Adams remembers sitting on
12   the couch in the living room directly in front of the windows with a glass coffee table in front of
13   her. Adams Decl., at ¶ 4. The defendant was to her left. Special Agent Walbridge was sitting
14   in an adjacent seat. The other agents present were busy executing the search warrant and did not
15   participate in the interview.
16         The defendant talked at length about his involvement with the eBay Affiliate Program,
17   including his use of a 1x1 pixel script to stuff cookies, and other matters. *Id.*, at ¶ 5; Exh. 7.
18   According to Special Agent Adams, the conversation was friendly and relaxed, and there was a
19   free-flowing exchange between the agents and the defendant. Adams Decl., at ¶ 5. The
20   defendant seemed eager to tell his side of the story. Special Agent Adams and Special Agent
21   Walbridge did not restrain the defendant in any way or apply any pressure to detain him. Also,
22   they did not isolate him or prevent him from leaving or talking with anyone.
23         Special Agent Adams does not recall how long the interview lasted. *Id.*, at ¶ 6. However
24   she remembers that the interview ended while the search was still going on. According to
25   Special Agent Adams, the conversation then shifted to chit-chat and casual talk. The defendant
26   spoke about his cats, the new house he was building, and dating the actress who played the Pink
27
28

UNITED STATES' OPPOS. TO MOTION
TO SUPPRESS EVIDENCE
CR 10-0495 EJD            3

Power Ranger.[2]  The defendant offered to show Special Agent Adams the blueprints to his new house, which were on the dining room table.

The defendant owned a brand-new Hummer H2, which he kept in the garage, and also used off-site servers for his business at a hosting provider in San Diego called SimpleNet.  *Id.*, at ¶ 7.  The defendant provided the agents with verbal consent to search his car as well as image his servers at SimpleNet.  He signed and dated written consent forms for both those searches. Exh.8.  The consent form for the Hummer stated, among other things, that "I have been advised of my right to refuse consent" and "I give this permission voluntarily."  The consent form for the servers stated "I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely and voluntarily, and not as the results of threats or promises of any kind."  At the completion of the search of the defendant's business/residence, agents took a photo of the search warrant and various property receipts he signed.  Exhs. 2 and 9.

During the discussion about the defendant's servers at SimpleNet, he indicated that the agents would not be able to get access to the servers without him.  Adams Decl., at ¶ 8.  So, he offered to escort them.  Subsequently, the defendant drove his Hummer to SimpleNet, with Special Agent Adams and Special Agent Walbridge following him in their vehicle.  Tim Hamon, an FBI forensic examiner, met the three of them there to assist with any imaging.  Once everyone arrived, the defendant took the group into SimpleNet by signing the entry log, entering his code, and scanning his finger.  At that time, Special Agent Adams believed that–based on the previous consent–the defendant was going to allow Hamon to image the servers.  However, even though the defendant had multiple servers at SimpleNet, he only gave the agents one particular hard drive.  That was then documented in the consent form.  The defendant then drove off.

The next day, the defendant made an unsolicited telephone call to Special Agent Adams to provide additional information that he had forgotten to mention the previous day.  *Id.*, at ¶ 9.

---

[2]The Pink Power Ranger is a character in the "Mighty Morphin Power Rangers" children's television series.  The television series was made into a movie in 1995.

UNITED STATES' OPPOS. TO MOTION
TO SUPPRESS EVIDENCE
CR 10-0495 EJD                                              4

1          Also on June 19, 2012, Special Agent Adams and Special Agent Walbridge wrote a
2 report documenting the substance of their interview with the defendant, including the substance
3 of their statements and questions to the defendant and his statements and answers.  Exh. 7.
4          On June 21, 2012–three days after the original interview–the defendant met Special
5 Agent Walbridge at a Starbucks Coffee in San Diego so the agent could return the hard drive the
6 defendant had voluntarily provided from SimpleNet.  Exh. 10
7          On June 29, 2007–11 days after the original interview–the defendant made a second
8 unsolicited telephone call to Special Agent Adams to provide even more information that he had
9 neglected to mention on June 18 and 19.   Adams Decl., at ¶ 10.
10         On August 13, 2007, the defendant visited the FBI office in San Diego and met with
11 Special Agent Walbridge.  The agent returned computer equipment to the defendant that had
12 been seized from his residence.  Exh. 11.
13         On August 29, 2007, Special Agent Adams followed up on an issue that Hogan had
14 raised earlier with her by sending him an email with a photograph.  Hogan replied the same day,
15 "Yep...that's him."   Adams Decl., at ¶ 11; Exh. 12.
16         On March 17, 2009–almost two years after the execution of the search warrant and
17 Hogan's original interview–Hogan sent Adams a letter dated March 10, 2009 stating that he
18 retained legal counsel in the matter.  Adams Decl., at ¶ 12; Exh. 13
19         On June 24, 2010, a grand jury indicted the defendant on 10 counts of wire fraud.
20         On June 25, 2010, the clerk issued a summons for the defendant to appear in court on
21 July 22, 2010 to make his initial appearance on the indictment.  The defendant subsequently
22 appeared on that date and the court arraigned him on the indictment.
23         On August 2, 2010, the defendant blogged about the case in a lengthy entry entitled
24 "Ramblings of A Wannabe Alien..."  Exh. 14.  Among other things, the defendant again admitted
25 to cookie stuffing.  For example, he stated that with regard to his participation in the eBay
26 affiliate program "[o]ne of things that was toyed with was a mechanism to force the end user to
27 click through to a site that they didn't actually click on."  The defendant did not mention
28 anything about being coerced or intimidated by the FBI during his initial interview on June 18,

2007 or in his follow-up conversations with Special Agent Adams or other agents. In fact, his only mention of the FBI was to claim that an unidentified FBI agent told him that the case was a "waste of resources."

On October 1, 2012–more than five years after the defendant's interview by Special Agent Adams and more than two years after the grand jury indicted him for cookie stuffing–the defendant filed this motion, claiming that he thought he was "in custody" on June 18, 2007 and that his statements to the FBI were the result of coercion and intimidation.[3]

## ARGUMENT

The defendant's argument that the Court should suppress his statements because he was "in custody" during his initial FBI interview on June 18, 2007 and was not given a *Miranda* warning is meritless.

### I. THE LEGAL STANDARD

*Miranda v. Arizona*, 384 U.S. 436 (1966), requires law enforcement, before initiating questioning, to give certain warnings to individuals who are in "custody." The paradigmatic *Miranda* situation of custodial interrogation is when a person is arrested in his home or on the

---

[3] As a threshold matter, the court should discount much of the defendant's sworn declaration offered in support of this motion.

First, the defendant wrote the declaration more than five years after the events in question. It is highly doubtful that he remembers all the details he recounts. In contrast, the agents involved in the search and interview prepared reports the day after the events happened–when everything was fresh in their mind.

Second, in his motion, the defendant artfully tries to squeeze into the legal analysis his supposed *subjective* (and totally conclusory) "feeling" that he was in custody. For example, the defendant's motion includes the following claims: "[H]e did not feel he was free to end ... [the] interrogation session ... let alone leave his apartment," "Mr. Hogan understood 'not under arrest' to mean that he would not be taken to jail when they were finished conducting a search," "Mr. Hogan did not feel that he was free to leave or to move about the apartment," "Mr. Hogan ... felt that he was not free to go [to the bathroom] without permission," "It was not until after Mr. Hogan presented the agent with the hard drive that he felt free to leave," and so on. However, the issue is not what the defendant "felt" or "understood."; it is what a reasonable person in the objective circumstances would feel or understand. The Supreme Court has repeatedly made clear that the determination of whether an individual was "in custody" depends on the objective circumstances of the interrogation, not the defendant's subjective views (or, for that matter, the interviewing agents' subjective views). *See, e.g.*, *Stansbury v. California*, 511 U.S. 318, 323 (1994) (citations omitted).

UNITED STATES' OPPOS. TO MOTION
TO SUPPRESS EVIDENCE
CR 10-0495 EJD                                6

street and whisked to a police station for questioning. *Howes v. Fields*, 132 S. Ct. 1181, 1190 (2012). However, there are also occasions when a person is in "custody" without a formal arrest. In such situations, the person must *at least* suffer a "restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (citations omitted) (emphasis added); *United States v. Hudgens*, 798 F.2d 1234, 1236 (9th Cir. 1986) (same).

For *Miranda* purposes, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. *Howes*, 132 S. Ct. at 1189. The initial step is determine whether, "in light of the objective circumstances of the interrogation ... a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* (internal quotation marks and citations omitted); *see also Stansbury*, 511 U.S. at 323 (stating that the "in custody" determination does not depend on "on the subjective views harbored by either the interrogating officers or the person being questioned"). To do this, the court must examine "*all* the circumstances surrounding the interrogation." *Howes*, 132 S. Ct. at 1189 (emphasis added).

The Supreme Court has made clear that whether an individual's freedom of movement was curtailed is only the first step in the analysis, not the last. A court should also determine "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 1189-90. In fact, "[t]he police are required to give *Miranda* warnings only where there has been such a restriction on a person's freedom as to render him 'in custody'." *California v. Beheler*, 463 U.S. 1121, 1124 (1983) (citation and internal quotation marks omitted). Of course, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

In addition, the Supreme Court has emphasized that "[v]oluntary confessions are not merely a proper element in law enforcement, they are an unmitigated good, essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Maryland*

1  *v. Shatzer*, 130 S.Ct. 1213, 1222 (2010) (internal quotation marks and citations omitted).

2  As noted above, the Supreme Court has held that a court should look to *all* the circumstances surrounding the interrogation to determine if an individual is "in custody." *See, e.g., Fields*, 132 S.Ct. at 1189. The Ninth Circuit has suggested some relevant factors in that regard: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001) (citation omitted).

For an in-home interrogation, the Ninth Circuit has also suggested the following factors: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats, (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made." *United States v. Craighead*, 539 F.3d 1073, 1084 (9th Cir. 2008).[4]

These factors are not exhaustive, and other factors may be relevant as well. *Id.*

## II. APPLICATION OF THE LEGAL STANDARD SET FORTH BY THE SUPREME COURT AND NINTH CIRCUIT SHOWS THAT THE DEFENDANT WAS NOT "IN CUSTODY" ON JUNE 18, 2007

The Court must look at "all the circumstances" surrounding the interview of the defendant on June 18, 2007 to determine if he was "in custody" including various factors set forth by the Ninth Circuit as well as other relevant factors. A review of these circumstances demonstrates that he was not in custody on that day.[5]

---

[4] It is not clear that *Craighead* in-home interrogation factors even apply to this case. While the defendant did live at the address where the interview took place, it was also the official (and only) address of Digital Point Solutions, a multimillion dollar company, the defendant owned and operated. If the defendant ran his business from a different location, it is unlikely that the agents would have obtained a search warrant for his residence.

[5] Tellingly, the defendant never claims that his confession on June 18, 2007 was involuntary. An involuntary statement is obtained through "physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Haynes v Washington*,
(continued...)

### A. EACH OF THE NINE FACTORS SET FORTH BY THE NINTH CIRCUIT IN THIS AREA FAVORS THE UNITED STATES AND, TOGETHER, DEMONSTRATES THAT THE DEFENDANT WAS NOT "IN CUSTODY" ON JUNE 18, 2007

An examination of the factors the Ninth Circuit has indicated are relevant in this area shows that every single one favors the United States. Accordingly, the defendant was not "in custody" on June 18, 2007 for *Miranda* purposes.

First, Special Agent Adams and Special Agent Walbridge did not use intimidating or accusatory language to summon the defendant. In fact, they did not "summon" the defendant at all. At the beginning of their interview with the defendant, the agents told him that he was not under arrest and was not being detained in any way. They also informed him that he did not have to talk with them. In response, the defendant specifically stated that he was willing to speak with them.

In addition, the conversation was friendly, relaxed, and free-flowing; the defendant was eager to share his side of the story with the agents. Indeed, the actions the defendant took during and after the interview reinforce the fact that it was voluntary: (1) the defendant signed written consent forms for his vehicle and off-site servers stating that he was consenting "voluntarily" and "not as the results of threats or promises of any kind"; (2) he offered to escort the agents to SimpleNet and get them through the elaborate security there; (3) he drove his own vehicle to SimpleNet; (4) he called the interviewing agent the next day with more information and then a few days after that with even more information; (5) he engaged in an email exchange with the interviewing agent and provided additional information; (6) he met the other interviewing agent twice; (7) he voluntarily went to the FBI San Diego office; (8) he did not hire a lawyer in the case for almost two years; and (9) he did not mention anything about FBI coercion or intimidation in his 2010 detailed blog entry about the case. A person in custody and bullied into confessing simply does not take such actions.

---

[5](...continued)
373 U.S. 503, 513-414 (1963). However, if the statement was voluntary–as he concedes, and is evidenced by the defendant's later voluntary recitation of many of the same facts–then it is hard to see how he was so intimidated and coerced that he felt he was in custody.

Second, the agents did not confront the defendant with evidence of his guilt. As the summary of the interview makes clear, the defendant freely admitted his guilt, putting his own spin on the matter. *See* Exh. 7. According to the summary, the defendant was fairly upfront about admitting his own conduct but did hesitate in implicating anyone else participating in the eBay fraud. However, when asked specifically about Brian Dunning, the defendant did then suggest that Dunning was cookie stuffing too. So, in fact, his only documented hesitation during the interview dealt with implicating others, not himself.[6]

In addition, Special Agent Adams notes that, at some point, the interview ended but the search was still going on. So, the defendant and two agents then turned to personal topics like the defendant's cats, new house, and dating history. The defendant offered to show Special Agent Adams the blueprints for his new house, which were located on the dining room table. If the agents had been busy "confronting" the defendant, it is highly unlikely that the conversation would taken such a turn.[7]

Third, the agents conducted the interview in the defendant's own living room. The three sat around a glass coffee table, with Special Adams sitting with her back to the windows and the defendant to her left. Where a suspect is in familiar surroundings, the element of compulsion that concerned the Supreme Court in *Miranda* is less likely to be present. *Orozco v. Texas*, 394 U.S. 324, 326 (1969). As the Ninth Circuit has stated, "An interview conducted in a suspect's ...

---

[6]The defendant compares this situation to that in *United States v. Lee*, 699 F.2d 466 (9th Cir. 1982). But in that case is inapposite for several reasons. For example, in *Lee* FBI agents questioned Lee in a *closed FBI car* for over an hour while police were investigating in and around his house, confronting him with the fact that Lee's wife had been murdered, and telling him that "it was time to tell the truth...." *Id.* at 468.

[7]The defendant makes a big deal about the fact that the agents gave him a copy of the search warrant–and claims that this is evidence of the agents' supposedly nefarious attempt to confront him with evidence of his guilt. Def.'s Br., at 12. However, giving a defendant a copy of a search warrant is standard procedure–and protects the interests of both the person whose premises are being searched and the agents themselves. Moreover, it is also required by law. *See* Fed. R. Crim. P. 41(f)(C) ("The officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from who, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property.").

UNITED STATES' OPPOS. TO MOTION
TO SUPPRESS EVIDENCE
CR 10-0495 EJD                                         10

living room ... might allow the suspect to take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere." *Craighead*, 539 F.3d at 1088; *see also Beckwith v. United States*, 425 U.S. 341, 342-43 (1976) (holding that defendant was not "in custody" when police arrived at his home at 8:00 a.m. and he was interviewed at his dining room table).

Fourth, the interview did not seem to last particularly long. Special Agent Adams does not recall how long the interview took, but the search lasted about three hours and the interview as conducted within this time frame, beginning after the search began and concluding before it ended. Special Agent Adams recalls that, at some point, the interview ended and the three engaged in casual conversation and chit-chat about various topics for a period of time. Moreover, Special Agent Adams remembers that the defendant was eager to tell his side of the story, and the conversation was free-flowing. So, even if the interview lasted an hour or so as the defendant recalls, that was not because the agents were asking the same question over and over again. It was because there was a lot of two-way discussion and the defendant volunteered a lot of information, much of which was not really relevant to the case. In other words, this was not a "marathon session designed to force a confession." *United States v. McKerlie*, 2011 WL 5191478, at *5 (D. Ariz. Oct. 3, 2011) (*quoting Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985)).

Fifth, the agents did not exert any pressure on the defendant to keep him in their presence or to answer questions. Adams Decl., at ¶ 4. In fact, the defendant also signed written consent forms for his vehicle and servers specifically stating that he was providing consent for those searches *voluntarily*. In addition, the defendant's and agents' own actions contradict the defendant's claim that he was coerced and intimidated, and thus functionally under arrest. For example, if the agents really were trying to keep the defendant "in custody," they would have never let him drive his own vehicle to SimpleNet (which the defendant himself says is a 25 minute drive from his business/residence); they would have put him in their FBI vehicle. Hogan Decl., at ¶ 14. Moreover, once everyone arrived at SimpleNet, if the defendant was really "in custody" the agents would have demanded that he allow them to image all his off-site servers as

UNITED STATES' OPPOS. TO MOTION
TO SUPPRESS EVIDENCE
CR 10-0495 EJD                                11

he had previously agreed. In fact, he apparently changed his mind and decided only to give them one hard drive. They accepted that decision. *See, e.g., United States v. Allen*, 699 F.2d 453, 459 (1982) (affirming district court's ruling that defendant was not in custody for *Miranda* purposes where agents did not make threats or promises to the defendant, did not restrain him, and did not exert pressure on him).

Sixth, with regard to the number of law enforcement personnel, the defendant tries to paint a picture of nine FBI agents roaming around the defendant's apartment with guns pointed. However, that is simply not the case. A total of nine agents did enter the apartment at some point but only some of them came in for the initial entry, two left early, and one was only there for a four minutes in the middle of the search to deliver some supplies. In fact, the search report indicates that the agents had "cleared" the apartment four minutes after entering, and thus were ready to begin executing the search warrant. Moreover, only two agents interviewed the defendant (it is standard practice for the FBI to interview individuals with two agents).

Special Agent Adams remembers being one of the last agents in the apartment. During the interview, she was not wearing any special FBI/police clothing (FBI agents wear civilian clothes, not uniforms) and she never showed her weapon to the defendant (all FBI agents carry firearms as part of their job). Besides Special Agent Adams, only Special Agent Walbridge was involved with the interview. Those two agents interviewed the defendant in the living room. Special Agent Adams remembers sitting in the couch with its back to the windows, with the defendant to her left and Walbridge near her. From that vantage point, the coffee table blocked Special Agent Adams from the door but the defendant had a clear view of the front door (as well as the entry and dining room) and his exit was not obstructed by furniture or anything else. In fact, no one was "guarding" the defendant or the door, or monitoring the interview. The other agents were busy executing the search warrant. And Special Agent Adams remembers that the conversation was friendly and free-ranging, and then segued into chit-chat and casual conversation.

Seventh, the defendant was not restrained whatsoever during the interview, either physically or by threats. Adams Decl., at ¶ 4. Contrary to the defendant's suggestion, he

UNITED STATES' OPPOS. TO MOTION
TO SUPPRESS EVIDENCE
CR 10-0495 EJD 12

1 certainly not under the agents' "physical control" and no there was no "guard[]." Def.'s Br, at 9.

2 The defendant emphasizes the supposed fact that Special Agent Walbridge checked the bathroom before the defendant used it and waited for him outside. Def.'s Br, at 2, 3, 9 and 11. But that hardly rises to the level of a formal arrest. In any event, agents are free to impose minimal restrictions on individuals to ensure agent safety, maintain the integrity of evidence, and maintain the status quo. *See, e.g., Beheler*, 463 U.S. at 1125 (suspect is only "in custody" when their freedom of movement is restricted so much that it amounts to a formal arrest); *Hudgens*, 798 F.2d at 1237 (even if suspect's freedom of action is inhibited in some degree, *Miranda* warnings need not be given before questioning); *United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir. 1982) (stating that strong but reasonable measures to ensure the safety of officers or the public can be taken without necessarily compelling a finding that the suspect was in custody); *United States v. Patterson*, 648 F.2d 625, 633 (9th Cir. 1981) (officers may take reasonable steps to maintain the status quo).

Moreover, as the agents told him before beginning the interview, the defendant remained free to leave his apartment or go to another area of the apartment (as long as he did not interfere with the execution of the search warrant). The fact that he happened to decide to stay in the living room during the search (until driving to SimpleNet) does not mean that he was "in custody."

Eighth, the agents did not make any attempt to isolate the defendant. Adams Decl., at ¶ 4. The defendant chose to live by himself in a 1700 square foot apartment with his cats, and he happened to be alone when the agents interviewed him. No one was turned away during the interview. If the defendant had wanted, he could have left and gone to a family or friend's apartment, or to a coffee shop; he could have visited the apartment common area; or he could have moved to his patio or a different room in the apartment that was not then being searched.[8]

---

[8]Contrary to the defendant's suggestion, this case is vastly different than *United States v. Kim*, 292 F.3d 969 (9th Cir. 2002). Def.'s Br., at 12-13. In that case, officers admitted Kim into her store where they were questioning her son, locked the door behind her even though her face was "really white," prevented the defendant's husband from entering the store (keeping him
(continued...)

Ninth, right at the start of the interview, the agents told the defendant that he was not detained in any way and did not have to talk with them. Adams Decl., at ¶ 3. As the Ninth Circuit has recognized, this fact alone goes a long way to showing that a defendant was not "in custody" for *Miranda*. *See, e.g.*, *Craighead*, 539 F.3d at 1087 ("If a law enforcement officer informs the suspect that he is not under arrest, that [his] statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe he is in custody.").[9]

Accordingly, given all the factors listed as possibly relevant by the Ninth Circuit, the defendant was not "in custody" for *Miranda* purposes on June 18, 2007.

---

[8](...continued)
waiting outside for three hours), surrounded the defendant to make her feel that she could not leave, told Kim to "shut up," restricted Kim's communication with her son, ordered her to speak English even though they were aware that she might have difficulty with that language, told her when and where she could sit, and so on.

[9]The defendant relies heavily on *United States v. Mittel-Carey*, 493 F.3d 36 (9th Cir. 2007), claiming that it "factual[ly] similar" to this case. Def.'s Br., at 6 n.1; *see also id.* at 7, 9, and 14. That is incorrect for two major reasons.

First, in that case, the court relied primarily on the "physical control" the agents exercised over Mittel-Carey. *See Mittel-Carey*, 493 F.3d at 40. Agents never told Mittel-Carey that he was not detained; ordered him to dress and go to a different part of his residence; physically separated him from his girlfriend; did not allow him to speak to his girlfriend alone; and escorted him within his house on three different occasions (including when he fed his pet rabbit on the back porch). In the instant case, agents told the defendant he was "not under arrest or being detained in any way." True, the defendant claims that Special Agent Walbridge walked with him to the bathroom (standing outside) but, even if that were accurate, there is no indication he was "escorted" anywhere else. Moreover, the defendant ran a multimillion dollar business out of the search location, and told agents he would escort *them* to SimpleNet (and through SimpleNet's security), taking his own vehicle for this purpose. And then, over the next few days, on his own initiative the defendant provided Special Agent Adams with additional information supplementing the original interview. In contrast, there is no evidence Mittel-Carey operated a company from his home, escorted agents anywhere, or called them up later and provided additional information.

Second, in *Mittel-Carey*, the court found that the "interrogating agent" made "coercive statements ... which seemed designed to elicit cooperation while carefully avoiding giving the defendant *Miranda* warnings." Here, there is no evidence whatsoever of any coercive statements.

UNITED STATES' OPPOS. TO MOTION
TO SUPPRESS EVIDENCE
CR 10-0495 EJD                                    14

**B.  OTHER RELEVANT FACTORS SHOW THAT THE DEFENDANT WAS NOT "IN CUSTODY" ON JUNE 18, 2007**

In evaluating whether the defendant was in custody, the court must look at all circumstances surrounding the interrogation from the perspective of whether a reasonable person in the defendant's shoes would have felt in custody.

In that regard, it is revealing that, totally unprompted, one day after the interview the defendant telephoned Special Adams to continue the interview and provide additional information he had forgotten to mention.  Moreover, a few days later, the defendant called her a second time–again unprompted–with even more information, and then, in August 2007, the agent emailed him to follow up on some of the information he provided and he responded affirmatively.  These facts destroy the defendant's argument.  A reasonable person in the defendant's shoes who felt coerced and intimidated by Special Agent Adams and "in custody" on June 18, 2007 would not follow up in this way.

And that is not all.  The defendant also voluntarily met twice with Agent Walbridge, the other agent who interviewed him, to obtain equipment back that he voluntarily relinquished to the FBI or that was seized.  The first meeting was at a Starbucks and the second at the FBI office.  A reasonable person who felt coerced and intimidated by Agent Walbridge would be highly unlikely to take such actions.

In addition, the defendant did not even bother to hire a lawyer to represent him in the case until almost two years after the interview–and he (not the law firm) personally notified Agent Adams of that fact.  A reasonable person who felt coerced and intimidated by the FBI and was worried about his statements would not have waited so long to hire an attorney.

Finally, two years ago, the defendant blogged about the case.  He did not mention anything about FBI intimidation or coercion.  Rather, his only comment in his blog entry about the FBI was that an unidentified FBI agent told him that the case was a waste of money.  A reasonable person who felt bullied into a confession by the FBI and then blogged about the matter would mention that fact.  He would not claim that an FBI agent did not believe in the

case.

Accordingly, the defendant's follow-up actions regarding the June 18, 2007 interview demonstrate that he was not "in custody" for *Miranda* purposes.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the defendant's motion to suppress evidence.

DATED: October 16, 2012                    Respectfully submitted,

                                                      MELINDA HAAG
                                                    United States Attorney

                                                               /s/
                                                  _____
                                                  MATTHEW A. LAMBERTI
                                                  Assistant United States Attorney