1   MELINDA HAAG (CABN 132612)
    United States Attorney
2
    MIRANDA KANE (CABN 150630)
3   Chief, Criminal Division

4   MATTHEW A. LAMBERTI (DCBN 460339)
    Assistant United States Attorneys
5
       150 Almaden Boulevard, Suite 900
6      San Jose, California 95113
       Telephone: (408) 535-5061
7      Facsimile: (408) 535-5066
       E-Mail: Matt.Lamberti@usdoj.gov
8
    Attorneys for Plaintiff
9                            UNITED STATES DISTRICT COURT

10                          NORTHERN DISTRICT OF CALIFORNIA

11                                  SAN JOSE DIVISION

12  UNITED STATES OF AMERICA,          )   No. CR 10-0495 EJD
                                       )
13         Plaintiff,                  )   **DECLARATION OF MATTHEW A.**
                                       )   **LAMBERTI SUPPORTING THE**
14         v.                          )   **UNITED STATES' OPPOSITION TO**
                                       )   **DEFENDANT'S MOTION TO**
15  SHAWN D. HOGAN,                    )   **SUPPRESS EVIDENCE**
                                       )
16         Defendant.                  )   Date:      October 30, 2012
                                       )   Time:      10:00 a.m.
17  _____)   Court:     Hon. Edward J. Davila

18         I, Matthew A. Lamberti, declare:

19         1. I am the Assistant United States Attorney assigned to prosecute the above-captioned

20  case.

21         2. Attached hereto as Exhibit 1 is a true and correct copy of an application and affidavit

22  for search warrant and a search warrant for 8465 Regents Road, #448, San Diego, California

23  approved June 15, 2007 by Magistrate Judge Ruben B. Brooks.

24         3. Attached hereto as Exhibit 2 is a true and correct copy of a report prepared by various

25  FBI agents on June 19, 2007 regarding the execution of the search warrant at 8465 Regents Road,

26  #448, San Diego, California on June 18, 2007.

27         4. Attached hereto as Exhibit 3 is a true and correct copy of a floor plan for 8465 Regents

28  Road, #448, San Diego, California, provided by Regents Court on October 15, 2012.

DECL. SUPPORTING OPPOS. TO MOTION TO SUPPRESS
CR 10-0495 EJD

5. Attached hereto as Exhibit 4 is a true and correct copy of photos taken by FBI Special Agent Nathaniel Dingle on June 18, 2007 at 8465 Regents Road, #448, San Diego, California.

6. Attached hereto as Exhibit 5 is a true and correct copy of a photo taken by Special Agent Dingle on June 18, 2007 at 8465 Regents Road, #448, San Diego, California.

7. Attached hereto as Exhibit 6 is a true and correct copy of a photos taken by Special Agent Dingle on June 18, 2007 at 8465 Regents Road, #448, San Diego, California.

8. Attached hereto as Exhibit 7 is a true and correct copy of an FBI report summarizing an interview with defendant Shawn D. Hogan that took place on June 18, 2007, and which is dated June 19, 2007.

9. Attached hereto as Exhibit 8 is a true and correct copy of consent forms signed by the defendant on June 18, 2007.

10. Attached hereto as Exhibit 9 is a true and correct copy of a photo taken by Special Agent Dingle on June 18, 2007 at 8465 Regents Road, #448, San Diego, California.

11. Attached hereto as Exhibit 10 is a true and correct copy of an FBI report regarding a meeting between FBI Special Agent Todd Walbridge and the defendant on June 21, 2007, dated June 25, 2007, and a receipt for property involved in this meeting, dated June 21, 2007.

12. Attached hereto as Exhibit 11 is a true and correct copy of an FBI report regarding a meeting between Special Agent Walbridge and FBI Special Agent Travis Johnson and the defendant on August 13, 2007, dated August 15, 2007, and a receipt for property involved in this meeting, dated August 13, 2007.

13. Attached hereto as Exhibit 12 is a true and correct copy of an email exchange between FBI Special Agent Melanie Adams and the defendant on August 29, 2007.

14. Attached hereto as Exhibit 13 is a true and correct copy of an FBI report regarding a letter received by Special Agent Adams from the defendant on March 17, 2009, dated March 18, 2009, and the letter itself, dated March 10, 2009.

///

///

///

1    15. Attached hereto as Exhibit 14 is a true and correct copy of a blog entry posted by the

2    defendant entitled "Ramblings Of A Wannabe Alien..." at blogs.digitalpoint.com on August 2,

3    2010.

4    I declare under penalty of perjury that the foregoing is true and correct to the best of my

5    knowledge and belief.

7    Executed on October 16, 2012, in San Jose, California

9                                        /s/

10                              MATTHEW A. LAMBERTI
                              Assistant United States Attorney

DECL. SUPPORTING OPPOS. TO MOTION TO SUPPRESS
CR 10-0495 EJD                              3



# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

In the Matter of the Search of

**SEARCH WARRANT**

8465 Regents Road, #448
San Diego, California 92112

**CASE NUMBER:** 07 MJ 1396

TO: Special Agent Todd Walbridge and any Authorized Officer of the United States:

Affidavit having been made before me by Special Agent Todd Walbridge of the Federal Bureau of Investigation who has reason to believe that on the premises known as:

    See Attachment A

in the Southern District of California there is now concealed a certain person or property, namely:

    See Attachment B

which constitutes evidence, fruits, and instrumentalities of criminal violations of Title 18, United States Code, Section 1343 (wire fraud).

I am satisfied that the affidavit and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of this warrant.

**YOU ARE HEREBY COMMANDED** to search on or before June 24, 2007 (not to exceed 10 days) the person or place named above for the person or property specified, serving this warrant and making the search in the daytime (6:00 A.M. to 10:00 P.M.) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this warrant to Hon. Ruben B. Brooks, United States Magistrate Judge, as required by law.

Issued:

June 15, 2007 at 3:50 am/pm at San Diego, California

HONORABLE RUBEN B. BROOKS
UNITED STATES MAGISTRATE JUDGE

ORDERED SEALED BY COURT

GOVERNMENT
EXHIBIT
1

| RETURN | | |
|---|---|---|
| DATE WARRANT RECEIVED | DATE AND TIME WARRANT EXECUTED | COPY OF WARRANT AND RECEIPT FOR ITEMS LEFT WITH |

INVENTORY MADE IN THE PRESENCE OF:

INVENTORY OF PERSON OR PROPERTY TAKEN PURSUANT TO THE WARRANT

**CERTIFICATION**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____   _____
U.S Judge or Magistrate Judge                Date

USA00606

## ATTACHMENT A
## DESCRIPTION OF LOCATION TO BE SEARCHED

The SUBJECT PREMISES, 8465 Regents Road, Apartment 448, San Diego, California, 92122 is described as an apartment located inside the Regents Court Apartment Complex. The complex is a stucco, four-story structure. Apartment #448 is located in the northeast corner of the complex on the fourth (top) floor. The numbers "448" are visible next to the entrance to the residence, which is a brown door.

## ATTACHMENT B

### ITEMS TO BE SEIZED

The records, documents, and materials to be seized from the SUBJECT PREMISES, 8465 Regents Road, #448, San Diego, CA 92122 (the residence of Shawn Hogan and the business address of Digital Point Solutions) that constitute evidence of violations of 18 U.S.C. § 1343 (wire fraud) include:

a. Computer files, logs, programs, scripts, or source code that refer to eBay, the eBay Affiliate Program, Digital Point Solutions, Commission Junction, and/or ValueClick or that refer to or contain tools, created, used, or distributed by Shawn Hogan and/or Digital Point Solutions (DPS) through Hogan's/DPS's ad network (e.g., "geovisitors," "website-country," "fmdigger," "zone-transfer," "keywords," "co-op ad" code, "network-ad") or any other tool, script or code that contains 1x1 (or similar size) pixels or that causes forced clicks, cloaking re-directs, cookie-stuffing, cookie-tracking, tracking tags, and/or web beacons, including any computer files, logs, programs, scripts, source code, or object code related to the development of any of the above tools;

b. Letters, documents, records, notes, E-mail, diaries, journals or other written commuications regarding eBay, the eBay Affiliate Program, Digital Point Solutions, Commission Junction, and/or ValueClick, or that refer to or contain tools created, used, or distributed by Shawn Hogan, and/or Digital Point Solutions, (e.g., "geovisitors," "website-country, "fmdigger," "zone-transfer," "keywords," "co-op ad" code, "network-ad"), any other tool, script or code that contains 1x1 (or similar size) pixels or that causes forced clicks, cloaking re-directs, cookie-stuffing, cookie-tracking, tracking tags, and/or web beacons, including any computer files, logs, programs, scripts, source code, or object code related to the development of any of the above tools;

c. Any and all electronic data storage media relating to items (b) and (c) above, capable of storing any of the items (d) and (e) above. Such media includes, but is not limited to computer hard drives, floppy diskettes, "Zip" or "Jaz" disks, flash drives, data tapes, or CD-ROM or DVD-ROM disks;



d. All electronic mail stored and presently contained in or on the computers located at the SUBJECT PREMISES that pertain to:

1. The websites www.shawnhogan.com or www.digitalpoint.com;

2. The eBay Affiliate Program, Digital Point Solutions, Commission Junction, ValueClick, or cookie-stuffing or other actions related to the placement of cookies on users' computers;

3. Conversations between Shawn Hogan, Brian Dunning, Todd Dunning or others related to cookie-stuffing or other actions related to the

placement of cookies on users' computers;

4.      All Internet routing and header information relating to those communications described in paragraphs d.1, d.2, and d.3, above;

e.      Any and all transactional information, to include log files, of all computer activity related to eBay's Affiliate Program, Commission Junction, ValueClick, or Shawn Hogan, or to the websites, www.shawnhogan.com, www.digitalpoint.com, the IP address range 216.9.35.48 through 216.9.35.63, and Digital Point Solutions, which includes dates, time, method of connecting, port, dial-up, and/or location;

f.      All business records that pertain to eBay, the eBay Affiliate Program, Commission Junction, ValueClick, Digital Point Solutions, or Shawn Hogan, or to the websites, www.shawnhogan.com, www.digitalpoint.com, including but not limited to spreadsheets, applications, subscribers' full names, buddy lists, aliases, associated and alternate e-mail addresses, all screen names, method of payment, phone numbers, addresses, and detailed billing records;

g.      All files, to include log files, scripts, source code, and tools, contained on the computer devices related to the company Digital Point Solutions and the websites www.shawnhogan.com and www.digitalpoint.com and/or the IP address range 216.9.35.48 through 216.9.35.63, and/or servers for Digital Point Solutions;

h.      Indicia of residence and indicia of use of computers within the residence;

i.      Documents, records, communications, scripts, source code, and/or files related to computer tools created, used, or distributed by Shawn Hogan, and/or Digital Point Solutions (e.g., "geovisitors," "website-country," "fmdigger," "zone-transfer," "keywords," "co-op ad" code, "network-ad") or any other tool that may contain 1x1 (or similar size) pixels;

j.      Documents, records, communications, scripts, source codes and/or files related to forcing clicks, cloaking re-directs, cookie-stuffing, cookie-tracking, tracking tags and/or web beacons;

k.      Documents, records, communications, and/or files related to tracking codes to track individual ad campaigns and/or advertising on various sites, to include spreadsheets and databases maintaining such information;

l.      Documents and/or files related to Digital Point Solutions Forum, http://forums/digitalpoint.com, to include names of the members and/or owners, members of the Forum that may have downloaded free tools that contain the 1x1 (or similar size) pixel, conversations within the Forum involving forcing clicks, cloaking re-directs, cookie-stuffing, cookie-tracking, tracking tags, web beacons, or other techniques to defraud;

2

USA00609

m. Records or communications between Hogan and others concerning the lawfulness or propriety of cookie-stuffing schemes, including records or communications between Hogan and others discussing the Terms and Conditions of eBay's Affiliate program;

n. Document and/or files regarding bank accounts and financial papers of Shawn Hogan and/or Digital Point Solutions, to include but not limited to all records of deposits from eBay, Commission Junction, and/or ValueClick.

o. Records regarding financial expenditures of monies paid to Hogan/Digital Point Solutions from eBay, Commission Junction, and/or Value Click, to include purchases or sales of assets such a vehicles, property, jewelry, computer equipment, or other assets related to Shawn Hogan and/or Digital Point Solutions since December 2003.

p. Records regarding any other websites affiliated with Shawn Hogan or Digital Point Solutions since December 2003;

q. Records or communications between Hogan and/or Digital'Point Solutions and others discussing any contracts, requests for services, letters of engagement, investigative plans, or invoices related to services provided to or for eBay, and/or the eBay Affiliate Program and/or Commission Junction and/or ValueClick;

r. Records or communications between Hogan and/or Digital Point Solutions and others discussing the names and identities of all individuals and third parties who were used to procure, or to attempt to procure websites, advertisements, tools and scripts related to cookie stuffing related to eBay or any e-commerce company;

## DEFINITIONS

a. The terms "records," "documents," "materials," "programs," "files," "logs," "scripts," "source code," "object code," "communications," "notes," or "applications" include all of the items in whatever form and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

1. Computer Hardware

Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. This includes any data-processing devices (such as central processing units, memory typewriters, self-contained "laptop" or

3

"notebook" computers, Personal Digital Assistants (PDAs), or "Blackberries");
internal and peripheral storage devices (such as fixed disks, external hard disks,
floppy disk drives and diskettes, tape drives and tapes, optical storage devices,
transistor-like binary devices, compact flash cards, smart media cards and other
memory storage devices); peripheral input/output devices (such as keyboards,
printers, scanners, plotters, video display monitors, and optical readers); related
communications devices (such as modems, cables and connections, recording
equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed
dialers, programmable telephone dialing or signaling devices, and electronic
tone-generating devices); as well as any devices, mechanisms, or parts that can be
used to restrict access to computer hardware (such as physical keys and locks).

2.      Computer Software

        Computer software is digital information which can be interpreted by a
computer and any of its related components to direct the way it works. Software
is stored in electronic, magnetic, optical, or other digital form. It commonly
includes programs to run operating systems, applications (like word-processing,
graphics, or spreadsheet programs, utilities, compilers, interpreters, and
communications programs).

3.      Computer-related Documentation

        Computer-related documentation consists of written, recorded, printed, or
electronically stored material which explains or illustrates how to configure or use
computer hardware, software, or other related items.

4.      Computer Passwords and Other Data Security Devices

        Computer passwords and other data security devices are designed to
restrict access to or hide computer software, documentation, or data. Data
security devices may consist of hardware, software, or other programming code.
A password (a string of alpha-numeric characters) usually operates as a sort of
digital key to "unlock" particular data security devices. Data security hardware
may include encryption devices, chips, and circuit boards. Data security software
or digital code may include programming code that creates "test" keys or "hot"
keys, which perform certain pre-set security functions when touched. Data
security software or code may also encrypt, compress, hide, or "booby-trap"
protected data to make it inaccessible or unusable, as well as reverse the process
to restore it.

4

5.    Computers.

The term "computer" as used herein is defined in 18 U.S.C. § 1030(e)(1), and includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

## COMPUTER SEARCH PROTOCOL

a.    Agents executing this search warrant will employ the following procedures regarding computers that may be found on the premises which may contain information subject to seizure pursuant to this warrant:

### Forensic Imaging

1.    After securing the premises, the executing agents will consult with a computer specialist to determine the feasibility of obtaining forensic images of electronic storage devices while on-site. The feasibility decision will be based upon the number of devices, the nature of the devices and the volume of data to be imaged. The preference is to image on-site if it can be done in a reasonable amount of time and without jeopardizing the integrity of the data and the safety of the agents. The number and type of computers and other devices and the number, type, and size of hard drives are of critical importance. It can take several hours to image a single hard drive — the bigger the drive, the longer it takes. As additional devices and hard drives are added, the length of time that the agents must remain on-site can become overly intrusive, dangerous, and impractical.

2.    If it is not feasible to image the data on-site, the computer equipment and any peripherals will be seized and transported off-site for imaging. Once a verified image has been obtained, the owner of the equipment will be notified and the equipment returned within thirty (30) days of seizure absent further application to this court.

3.    A forensic image is an exact physical copy of the hard drive or other media. It is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant. A forensic image captures all of the data on the hard drive or other media without the data being viewed and without changing the data in any way. This is in sharp contrast to what transpires when a computer running the common Windows operating system is started, if only to peruse and copy data — data is irretrievably changed and lost. Here is why: When a Windows computer is started, the operating system proceeds to write hundreds of new files about its status and operating environment. These new files may be written to places on the hard drive that may contain deleted or other remnant data. That data, if overwritten, is lost permanently. In addition, every time a file is accessed, unless the access is done by trained professionals using special equipment, methods and software, the

5

operating system will re-write the metadata for that file. Metadata is information about a file that the computer uses to manage information. If an agent merely opens a file to look at it, Windows will overwrite the metadata which previously reflected the last time the file was accessed. The lost information may be critical.

4.      Special software, methodology, and equipment is used to obtain forensic images. Among other things, forensic images normally are "hashed," that is, subjected to a mathematical algorithm to the granularity of 1038 power, an incredibly large number much more accurate than the best DNA testing available today. The resulting number, known as a "hash value" confirms that the forensic image is an exact copy of the original and also serves to protect the integrity of the image in perpetuity. Any change, no matter how small, to the forensic image will affect the hash value so that the image can no longer be verified as a true copy.

Forensic Analysis

5.      After obtaining a forensic image, the data will be analyzed. Analysis of the data following the creation of the forensic image is a highly technical process that requires specific expertise, equipment and software. There are literally thousands of different hardware items and software programs that can be commercially purchased, installed and custom-configured on a user(s computer system. Computers are easily customized by their users. Even apparently identical computers in an office environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

6.      Analyzing the contents of a computer, in addition to requiring special technical skills, equipment and software also can be very tedious. It can take days to properly search a single hard drive for specific data. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. As mentioned above, the computer may have stored information about the data at issue: who created it, when it was created, when was it last accessed, when was it last modified, when was it last printed and when it was deleted. Sometimes it is possible to recover an entire document that never was saved to the hard drive if the document was printed. Operation of the computer by non-forensic technicians effectively destroys this and other trace evidence. Moreover, certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications do not store data as searchable text. The data is saved in a proprietary non-text format. Microsoft Outlook data is an example of a commonly used program that stores data in a non-textual, proprietary manner; ordinary keyword searches will not reach this data. Documents printed by the computer, even if the document never was saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. Similarly, faxes sent to the computer are stored as

6

USA00613

graphic images and not as text.

7.    Analyzing data on-site has become increasingly impossible as the volume of data stored on a typical computer system has become mind-boggling. For example, a single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Computer hard drives are now capable of storing more than 100 gigabytes of data and are commonplace in new desktop computers. And, this data may be stored in a variety of formats or encrypted. The sheer volume of data also has extended the time that it takes to analyze data in a laboratory. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. Even perusing file structures can be laborious if the user is well-organized. Producing only a directory listing of a home computer can result in thousands of pages of printed material most of which likely will be of limited probative value.

8.    Based on the foregoing, searching any computer or forensic image for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained; criminals can mislabel and hide files and directories, use codes to avoid using keywords, encrypt files, deliberately misspell certain words, delete files, and take other steps to defeat law enforcement. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear necessary to locate and retrieve digital evidence within the scope of this warrant.

9.    All forensic analysis of the imaged data will be directed exclusively to the identification and seizure of information within the scope of this warrant.

7

USA00614

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

FILED

07 JUN 15 PM 4: 26

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                    DEPUTY

In the Matter of the Search of

8465 Regents Road, #448
San Diego, California 92112

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

**CASE NUMBER:**  '07 MJ 1396

I, Todd Walbridge, being duly sworn depose and say:

I am a Special Agent of the Federal Bureau of Investigation and have reason to believe that on the property or premises known as:

   See Attachment A

in the Southern District of California there is now concealed a certain person or property, namely:

   See Attachment B

ORDERED SEALED BY COURT

which is:

   Evidence, fruits of crime, property designed for use or used in committing criminal offenses including violations of Title 18, United States Code, Section 1343 (wire fraud). The facts to support a finding of probable cause are as follows:

   See attached Affidavit of Todd Walbridge continued on the attached sheet and made a part hereof.   X   Yes _____ No

TODD WALBRIDGE
Special Agent
Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence
June 15, 2007 at San Diego, California:

HON. RUBEN B. BROOKS
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
## DESCRIPTION OF LOCATION TO BE SEARCHED

The SUBJECT PREMISES, 8465 Regents Road, Apartment 448, San Diego, California, 92122 is described as an apartment located inside the Regents Court Apartment Complex. The complex is a stucco, four-story structure. Apartment #448 is located in the northeast corner of the complex on the fourth (top) floor. The numbers "448" are visible next to the entrance to the residence, which is a brown door.

## ATTACHMENT B

### ITEMS TO BE SEIZED

The records, documents, and materials to be seized from the SUBJECT PREMISES, 8465 Regents Road, #448, San Diego, CA 92122 (the residence of Shawn Hogan and the business address of Digital Point Solutions) that constitute evidence of violations of 18 U.S.C. § 1343 (wire fraud) include:

a.      Computer files, logs, programs, scripts, or source code that refer to eBay, the eBay Affiliate Program, Digital Point Solutions, Commission Junction, and/or ValueClick or that refer to or contain tools, created, used, or distributed by Shawn Hogan and/or Digital Point Solutions (DPS) through Hogan's/DPS's ad network (e.g., "geovisitors," "website-country," "fmdigger," "zone-transfer," "keywords," "co-op ad" code, "network-ad") or any other tool, script or code that contains 1x1 (or similar size) pixels or that causes forced clicks, cloaking re-directs, cookie-stuffing, cookie-tracking, tracking tags, and/or web beacons, including any computer files, logs, programs, scripts, source code, or object code related to the development of any of the above tools;

b.      Letters, documents, records, notes, E-mail, diaries, journals or other written commuications regarding eBay, the eBay Affiliate Program, Digital Point Solutions, Commission Junction, and/or ValueClick, or that refer to or contain tools created, used, or distributed by Shawn Hogan, and/or Digital Point Solutions, (e.g., "geovisitors," "website-country, "fmdigger," "zone-transfer," "keywords," "co-op ad" code, "network-ad"), any other tool, script or code that contains 1x1 (or similar size) pixels or that causes forced clicks, cloaking re-directs, cookie-stuffing, cookie-tracking, tracking tags, and/or web beacons, including any computer files, logs, programs, scripts, source code, or object code related to the development of any of the above tools;

c.      Any and all electronic data storage media relating to items (b) and (c) above, capable of storing any of the items (d) and (e) above.  Such media includes, but is not limited to computer hard drives, floppy diskettes, "Zip" or "Jaz" disks, flash drives, data tapes, or CD-ROM or DVD-ROM disks;

d.      All electronic mail stored and presently contained in or on the computers located at the SUBJECT PREMISES that pertain to:

1.      The websites www.shawnhogan.com or www.digitalpoint.com;

2.      The eBay Affiliate Program, Digital Point Solutions, Commission Junction, ValueClick, or cookie-stuffing or other actions related to the placement of cookies on users' computers;

3.      Conversations between Shawn Hogan, Brian Dunning, Todd Dunning or others related to cookie-stuffing or other actions related to the

USA00617

placement of cookies on users' computers;

4.      All Internet routing and header information relating to those communications described in paragraphs d.1, d.2, and d.3, above;

e.      Any and all transactional information, to include log files, of all computer activity related to eBay's Affiliate Program, Commission Junction, ValueClick, or Shawn Hogan, or to the websites, www.shawnhogan.com, www.digitalpoint.com, the IP address range 216.9.35.48 through 216.9.35.63, and Digital Point Solutions, which includes dates, time, method of connecting, port, dial-up, and/or location;

f.      All business records that pertain to eBay, the eBay Affiliate Program, Commission Junction, ValueClick, Digital Point Solutions, or Shawn Hogan, or to the websites, www.shawnhogan.com, www.digitalpoint.com, including but not limited to spreadsheets, applications, subscribers' full names, buddy lists, aliases, associated and alternate e-mail addresses, all screen names, method of payment, phone numbers, addresses, and detailed billing records;

g.      All files, to include log files, scripts, source code, and tools, contained on the computer devices related to the company Digital Point Solutions and the websites www.shawnhogan.com and www.digitalpoint.com and/or the IP address range 216.9.35.48 through 216.9.35.63, and/or servers for Digital Point Solutions;

h.      Indicia of residence and indicia of use of computers within the residence;

i.      Documents, records, communications, scripts, source code, and/or files related to computer tools created, used, or distributed by Shawn Hogan, and/or Digital Point Solutions (e.g., "geovisitors," "website-country," "fmdigger," "zone-transfer," "keywords," "co-op ad" code, "network-ad") or any other tool that may contain 1x1 (or similar size) pixels;

j.      Documents, records, communications, scripts, source codes and/or files related to forcing clicks, cloaking re-directs, cookie-stuffing, cookie-tracking, tracking tags and/or web beacons;

k.      Documents, records, communications, and/or files related to tracking codes to track individual ad campaigns and/or advertising on various sites, to include spreadsheets and databases maintaining such information;

l.      Documents and/or files related to Digital Point Solutions Forum, http://forums/digitalpoint.com, to include names of the members and/or owners, members of the Forum that may have downloaded free tools that contain the 1x1 (or similar size) pixel, conversations within the Forum involving forcing clicks, cloaking re-directs, cookie-stuffing, cookie-tracking, tracking tags, web beacons, or other techniques to defraud;

2

USA00618

m. Records or communications between Hogan and others concerning the lawfulness or propriety of cookie-stuffing schemes, including records or communications between Hogan and others discussing the Terms and Conditions of eBay's Affiliate program;

n. Document and/or files regarding bank accounts and financial papers of Shawn Hogan and/or Digital Point Solutions, to include but not limited to all records of deposits from eBay, Commission Junction, and/or ValueClick.

o. Records regarding financial expenditures of monies paid to Hogan/Digital Point Solutions from eBay, Commission Junction, and/or Value Click, to include purchases or sales of assets such a vehicles, property, jewelry, computer equipment, or other assets related to Shawn Hogan and/or Digital Point Solutions since December 2003.

p. Records regarding any other websites affiliated with Shawn Hogan or Digital Point Solutions since December 2003;

q. Records or communications between Hogan and/or Digital Point Solutions and others discussing any contracts, requests for services, letters of engagement, investigative plans, or invoices related to services provided to or for eBay, and/or the eBay Affiliate Program and/or Commission Junction and/or ValueClick;

r. Records or communications between Hogan and/or Digital Point Solutions and others discussing the names and identities of all individuals and third parties who were used to procure, or to attempt to procure websites, advertisements, tools and scripts related to cookie stuffing related to eBay or any e-commerce company;

## DEFINITIONS

a. The terms "records," "documents," "materials," "programs," "files," "logs," "scripts," "source code," "object code," "communications," "notes," or "applications" include all of the items in whatever form and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

1. Computer Hardware

Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. This includes any data-processing devices (such as central processing units, memory typewriters, self-contained "laptop" or

3

"notebook" computers, Personal Digital Assistants (PDAs), or "Blackberries");
internal and peripheral storage devices (such as fixed disks, external hard disks,
floppy disk drives and diskettes, tape drives and tapes, optical storage devices,
transistor-like binary devices, compact flash cards, smart media cards and other
memory storage devices); peripheral input/output devices (such as keyboards,
printers, scanners, plotters, video display monitors, and optical readers); related
communications devices (such as modems, cables and connections, recording
equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed
dialers, programmable telephone dialing or signaling devices, and electronic
tone-generating devices); as well as any devices, mechanisms, or parts that can be
used to restrict access to computer hardware (such as physical keys and locks).

2.      Computer Software

        Computer software is digital information which can be interpreted by a
computer and any of its related components to direct the way it works. Software
is stored in electronic, magnetic, optical, or other digital form. It commonly
includes programs to run operating systems, applications (like word-processing,
graphics, or spreadsheet programs, utilities, compilers, interpreters, and
communications programs).

3.      Computer-related Documentation

        Computer-related documentation consists of written, recorded, printed, or
electronically stored material which explains or illustrates how to configure or use
computer hardware, software, or other related items.

4.      Computer Passwords and Other Data Security Devices

        Computer passwords and other data security devices are designed to
restrict access to or hide computer software, documentation, or data. Data
security devices may consist of hardware, software, or other programming code.
A password (a string of alpha-numeric characters) usually operates as a sort of
digital key to "unlock" particular data security devices. Data security hardware
may include encryption devices, chips, and circuit boards. Data security software
or digital code may include programming code that creates "test" keys or "hot"
keys, which perform certain pre-set security functions when touched. Data
security software or code may also encrypt, compress, hide, or "booby-trap"
protected data to make it inaccessible or unusable, as well as reverse the process
to restore it.

4

5.      Computers

The term "computer" as used herein is defined in 18 U.S.C. § 1030(e)(1),
and includes an electronic, magnetic, optical, electrochemical, or other high speed
data processing device performing logical, arithmetic, or storage functions, and
includes any data storage facility or communications facility directly related to or
operating in conjunction with such device.

## COMPUTER SEARCH PROTOCOL

a.      Agents executing this search warrant will employ the following procedures
regarding computers that may be found on the premises which may contain information subject
to seizure pursuant to this warrant:

### Forensic Imaging

1.      After securing the premises, the executing agents will consult with a computer
specialist to determine the feasibility of obtaining forensic images of electronic storage devices
while on-site. The feasibility decision will be based upon the number of devices, the nature of
the devices and the volume of data to be imaged. The preference is to image on-site if it can be
done in a reasonable amount of time and without jeopardizing the integrity of the data and the
safety of the agents. The number and type of computers and other devices and the number, type,
and size of hard drives are of critical importance. It can take several hours to image a single hard
drive — the bigger the drive, the longer it takes. As additional devices and hard drives are
added, the length of time that the agents must remain on-site can become overly intrusive,
dangerous, and impractical.

2.      If it is not feasible to image the data on-site, the computer equipment and any
peripherals will be seized and transported off-site for imaging. Once a verified image has been
obtained, the owner of the equipment will be notified and the equipment returned within thirty
(30) days of seizure absent further application to this court.

3.      A forensic image is an exact physical copy of the hard drive or other media. It is
essential that a forensic image be obtained prior to conducting any search of the data for
information subject to seizure pursuant to this warrant. A forensic image captures all of the data
on the hard drive or other media without the data being viewed and without changing the data in
any way. This is in sharp contrast to what transpires when a computer running the common
Windows operating system is started, if only to peruse and copy data — data is irretrievably
changed and lost. Here is why: When a Windows computer is started, the operating system
proceeds to write hundreds of new files about its status and operating environment. These new
files may be written to places on the hard drive that may contain deleted or other remnant data.
That data, if overwritten, is lost permanently. In addition, every time a file is accessed, unless the
access is done by trained professionals using special equipment, methods and software, the

5

USA00621

operating system will re-write the metadata for that file. Metadata is information about a file that the computer uses to manage information. If an agent merely opens a file to look at it, Windows will overwrite the metadata which previously reflected the last time the file was accessed. The lost information may be critical.

4. Special software, methodology, and equipment is used to obtain forensic images. Among other things, forensic images normally are "hashed," that is, subjected to a mathematical algorithm to the granularity of 1038 power, an incredibly large number much more accurate than the best DNA testing available today. The resulting number, known as a "hash value" confirms that the forensic image is an exact copy of the original and also serves to protect the integrity of the image in perpetuity. Any change, no matter how small, to the forensic image will affect the hash value so that the image can no longer be verified as a true copy.

### Forensic Analysis

5. After obtaining a forensic image, the data will be analyzed. Analysis of the data following the creation of the forensic image is a highly technical process that requires specific expertise, equipment and software. There are literally thousands of different hardware items and software programs that can be commercially purchased, installed and custom-configured on a user(s computer system. Computers are easily customized by their users. Even apparently identical computers in an office environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

6. Analyzing the contents of a computer, in addition to requiring special technical skills, equipment and software also can be very tedious. It can take days to properly search a single hard drive for specific data. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. As mentioned above, the computer may have stored information about the data at issue: who created it, when it was created, when was it last accessed, when was it last modified, when was it last printed and when it was deleted. Sometimes it is possible to recover an entire document that never was saved to the hard drive if the document was printed. Operation of the computer by non-forensic technicians effectively destroys this and other trace evidence. Moreover, certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications do not store data as searchable text. The data is saved in a proprietary non-text format. Microsoft Outlook data is an example of a commonly used program that stores data in a non-textual, proprietary manner; ordinary keyword searches will not reach this data. Documents printed by the computer, even if the document never was saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. Similarly, faxes sent to the computer are stored as

6

USA00622

graphic images and not as text.

7.    Analyzing data on-site has become increasingly impossible as the volume of data stored on a typical computer system has become mind-boggling. For example, a single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Computer hard drives are now capable of storing more than 100 gigabytes of data and are commonplace in new desktop computers. And, this data may be stored in a variety of formats or encrypted. The sheer volume of data also has extended the time that it takes to analyze data in a laboratory. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. Even perusing file structures can be laborious if the user is well-organized. Producing only a directory listing of a home computer can result in thousands of pages of printed material most of which likely will be of limited probative value.

8.    Based on the foregoing, searching any computer or forensic image for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained; criminals can mislabel and hide files and directories, use codes to avoid using keywords, encrypt files, deliberately misspell certain words, delete files, and take other steps to defeat law enforcement. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear necessary to locate and retrieve digital evidence within the scope of this warrant.

9.    All forensic analysis of the imaged data will be directed exclusively to the identification and seizure of information within the scope of this warrant.

7

USA00623

1       AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

2           I, Todd Walbridge, Special Agent of the Federal Bureau of Investigation (FBI), being duly sworn,

3   hereby declare as follows:

4                    **OVERVIEW AND AGENT BACKGROUND**

5           1.      I am an "investigative or law enforcement officer of the United States," within

6   the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States

7   who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in

8   Section 2516, Title 18, United States Code.

9           2.      I am employed as a Special Agent (SA) of the Federal Bureau of Investigation

10  (FBI) and have been so for over three and a half years. I am currently assigned to the San Diego

11  Division.  Since that time, I have received training in general law enforcement and in cyber

12  investigations including crimes committed utilizing computers and computer networks, such as hacking,

13  denial of service attacks, and malicious code. I have experience in investigations concerning white

14  collar crime matters within the Criminal Division of the FBI. I have participated in criminal

15  investigations involving hacking, bank fraud, investment fraud, bank robberies, fugitives, and

16  kidnappings. Prior to my employment as a Special Agent, I was employed in the computer technology

17  field for over eight years.

18          3.      As part of an ongoing FBI investigation, I make this affidavit in support of an

19  application by the United States of America for a warrant to search for evidence, fruits, and

20  instrumentalities of criminal activity located at the following locations:

21      a.      the residence of Shawn Dean Hogan (hereafter "Hogan") and the business

22              address of Digital Point Solutions at 8465 Regents Road, Apartment #448, San

23              Diego, California, 92122 ("the SUBJECT PREMISES 1");

24      b.      the residence of Brian Andrew Dunning (hereafter "Dunning") and the business

25              address of Kessler's Flying Circus and Thunderwood Holdings located at 15

26              High Bluff, Laguna Niguel, California, 92677 ("the SUBJECT PREMISES 2");

27      c.      the location of the servers for web hosting services utilized by Dunning at

28              Rackspace.com, d/b/a Rackspace Managed Hosting, which is located at 9725

                Datapoint Drive, Suite 100, San Antonio, Texas, 78229 ("the SUBJECT

1    PREMISES 3").

2    Each of the SUBJECT PREMISES is described in the applicable Attachment A. As set forth herein,

3    probable cause exists to believe that the items described in the applicable Attachment B, which items

4    constitute evidence, fruits, and/or instrumentalities of the violations of Title 18, United States Code,

5    Section 1343 (wire fraud) are present at the applicable SUBJECT PREMISES. In sum, it is alleged that

6    Hogan and Dunning used an executable script[1] within a1x1 pixel[2] to "cookie stuff"[3] in order to

7    fraudulently obtain payments from eBay through eBay's

8    Affiliate program.

9           4.    The facts set forth in this affidavit are based on my own personal knowledge,

10   knowledge obtained during my participation in this investigation; knowledge obtained from other FBI

11   agents and individuals; oral and written communications with others who have personal knowledge of

12   the events and circumstances described herein; and information gained through my training and

13   experience. Because this affidavit is submitted for the limited purpose of establishing probable cause

14   in support of the application for a search warrant, it does not set forth each and every fact that I or others

15   have learned during the course of this investigation.

16

17          [1] Script is another term for a macro or batch file, a script is a list of commands that can be

18   executed without user interaction. A script language is a simple programming language with which you

19   can write scripts.

20          [2] A 1x1 pixel is often a transparent graphic image (also known as a "web beacon," "web bug,"

21   or "pixel tag") used in combination with a cookie that is placed on a website or in an e-mail that is used

22   to monitor the behavior of the user visiting the website or sending the e-mail. When the HTML code

23   for the web beacon points to a site to retrieve the image, it can at the same time pass along information

24   such as the Internet Protocol address of the computer that retrieved the image, the time the web beacon

25   was viewed and for how long, and the type of browser that retrieved the image.

26          [3] "Cookie stuffing" can be defined as setting a cookie on a user's computer without a real "click"

27   by that user.

28                                    2

1

**SUBJECT PREMISES**

2          5.          The SUBJECT PREMISES 1 is located at 8465 Regents Road, Apartment #448,

3    San Diego, California, 94122 and is described as an apartment located inside the Regents Court

4    Apartment Complex. The complex is a stucco, four-story structure. Apartment #448 is located in the

5    northeast corner of the complex on the fourth (top) floor. The numbers "448" are visible next to the

6    entrance to the residence, which is a brown door.

7          6.          The SUBJECT PREMISES 2 is located at 15 High Bluff, Laguna Niguel,

8    California, 92677. The SUBJECT PREMISES 2 is described as a single family residence with a light

9    brown tile roof. The residence has light brown stucco with light brown wood trim. In front of the

10   residence is a three car garage with brick pillars on either side. On the brick pillar on the right side is

11   the number "15."

12         7.          The SUBJECT PREMISES 3 is the location of servers utilized by Brian Dunning

13   at web hosting service provider, Rackspace.com, d/b/a Rackspace Managed Hosting, located at 9725

14   Datapoint Drive, Suite 100, San Antonio, Texas, 78229 described as the servers hosting

15   www.briandunning.com, www.thunderwood.com, www.wholinked.com, profilemaps.info and/or IP

16   addresses 72.32.11.26 and 72.32.102.215 or any account in the name of Brian Dunning and/or Kessler's

17   Flying Circus.

18         8.          Each of the SUBJECT PREMISES is described in the applicable Attachment A.

19                         **APPLICABLE STATUTE**

20

21         9.          Title 18, United States Code, Section 1343 states:

22

23   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for

24   obtaining money or property by means of false or fraudulent pretenses, representations,

25   or promises, transmits or causes to be transmitted by means of wire, radio, or television

26   communication in interstate or foreign commerce, any writings, signs, signals, pictures,

27   or sounds for the purpose of executing such scheme or artifice, shall be fined under this

28                              3

1       title or imprisoned not more than 20 years, or both.

2

3                **BACKGROUND REGARDING COMPUTERS, THE INTERNET, AND E-MAIL**

4               10.     The term "computer" as used herein is defined in 18 U.S.C. § 1030(e)(1), and

5       includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device

6       performing logical, arithmetic, or storage functions, and includes any data storage facility or

7       communications facility directly related to or operating in conjunction with such device.

8               11.     I have had both training and experience in the investigation of computer-related

9       crimes. Based on my training, experience and knowledge, I know the following:

10      a.      The Internet is a worldwide network of computer systems operated by

11      governmental entities, corporations, and universities. In order to access the Internet, an individual

12      computer user must subscribe to an access provider, which operates a host computer system with direct

13      access to the Internet. The world wide web ("www") is a functionality of the Internet which allows users

14      of the Internet to share information;

15      b.      Internet Service Providers ("ISPs"): Most individuals and businesses

16      obtain access to the Internet through businesses known as Internet Service Providers ("ISPs").

17      c.      With a computer connected to the Internet, an individual computer user

18      can make electronic contact with millions of computers around the world. This connection can be made

19      by any number of means, including modem, local area network, wireless and numerous other methods;

20      d.      Internet Protocol Address ("IP address"): An Internet Protocol address is

21      a unique numeric address used to identify computers on the Internet. The standard format for IP

22      addressing consists of four numbers between 0 and 255 separated by dots (e.g., 149.101.10.40). Every

23      computer connected to the Internet (or group of computers using the same account to access the Internet)

24      must be assigned an IP address so that Internet traffic sent from and directed to that computer is directed

25      properly from its source to its destination. Internet service providers ("ISPs") assign IP addresses to their

26      customers' computers. An ISP might assign a different IP address to a customer each time the customer

27      makes an Internet connection (so-called "dynamic IP addressing"), or it might assign an IP address to

28                                                      4

USA00627

1    a customer permanently or for a fixed period of time (so-called "static IP addressing"). The IP address
2    used by a computer attached to the Internet is unique for the duration of a particular session; that is, from
3    connection to disconnection. ISP's typically log their customers' connections, which means that the ISP
4    can identify which of their customers was assigned a specific IP address during a particular session.

5         e.      A co-location facility is a company, usually a web service company, which offers a
6    customer a secure place to physically house their hardware and equipment as opposed to locating it in
7    their offices or warehouses where the potential for fire, theft, or vandalism is much greater. These
8    facilities usually provide secured cage or cabinet, regulated power, dedicated Internet connection and
9    security.

10        f.      A web hosting service provider is in the business of providing server space, web services,
11   and file maintenance for websites controlled by individuals or companies that do not have their own web
12   servers. Many ISPs, such as America Online, will allow subscribers a small amount of server space to
13   host a personal web page. Other commercial ISPs will charge the user a fee depending on the
14   complexity of the site being hosted.

15        g.      E-mail is a popular form of transmitting messages and/or files in an
16   electronic environment between computer users. A server is a computer that is attached to a dedicated
17   network and serves many users. An e-mail server may allow users to post and read messages and to
18   communicate via electronic means. When an individual computer user sends e-mail, it is initiated at the
19   user's computer, transmitted to the subscriber's mail server, then transmitted to its final destination;

20        h.      Any e-mail that is sent to a subscriber is stored in the subscriber's "mail
21   box" on the provider's servers until the subscriber deletes the e-mail or the subscriber's mailbox exceeds
22   the storage limits preset by the e-mail provider. If the message is not deleted by the subscriber, the
23   account is below the maximum limit, and the subscriber accesses the account periodically, that message
24   can remain on the provider's servers indefinitely;

25        i.      When the subscriber sends an e-mail, it is initiated at the user's computer,
26   transferred via the Internet to the servers of the e-mail provider, and then transmitted to its end
27   destination. Users have the option of saving a copy of the e-mail sent. Unless the user specifically

28                                              5

1   deletes the e-mail from the e-mail account, the e-mail can remain on the system indefinitely. The sender
2   can delete the stored e-mail message thereby eliminating it from the e-mail box maintained at the e-mail
3   provider, but that message will remain in the recipient's e-mail box unless the recipient deletes it as well
4   or unless the recipient's account is subject to account size limitations;

5     j.  A subscriber can store files, including e-mails and image files, on servers
6   maintained and/or owned by the e-mail provider; and e-mails and image files stored on a e-mail provider
7   server by a subscriber may not necessarily be located in the subscriber's home computer. The subscriber
8   may store e-mails and/or other files on the provider's server for which there is insufficient storage space
9   in the subscriber's computer and/or which he/she does not wish to maintain in the computer in his/her
10  residence. A search of the files in the computer in the subscriber's residence will not necessarily
11  uncover the files that the subscriber has stored on the e-mail provider's server.

12    k.  Data that is processed by a computer may be written to the computer's
13  internal hard drive or other storage medium even if the user does not intentionally save the information.
14  Other storage medium may include compact discs ("CDs"), digital video disks ("DVDs"), floppy
15  diskettes, thumb drives, pocket hard drives, external hard drives and flash drives. For example, a
16  computer operating system may take random data out of working memory and use it to "pad" files on
17  a computer hard drive during the storage process.

18    l.  Electronic information can remain on computer storage media, such as
19  internal and external hard drives, pocket drives, thumb drives, CDs, DVDs, diskettes, and flash drives,
20  for an indefinite period of time. Even when a computer user attempts to delete records from a computer
21  storage medium, the records may still exist and be recovered through computer forensic techniques

22    m.  Computer files may be easily moved from computer to computer, using
23  direct wire connections or through the use of storage media such as floppy diskettes, CDs, DVDs,
24  diskettes, thumb drives, pocket drives, flash drives and USB drives.

25    n.  A server is a centralized computer that provides services for other computers connected
26  to it via a network. The other computers attached to the server are sometimes called "clients." Notably,
27  server computers can be physically stored in any location: it is common for a network's server to be

28                6

1    located hundreds (even thousands) of miles away from the client computers.

2        o.    A domain is a group of Internet devices that are owned or operated by a specific
3    individual, group, or organization. Devices within a domain are assigned IP addresses within a certain
4    range of numbers, and are usually administered according to the same set of rules and procedures.

5        p.    A domain name identifies a computer or group of computers on the Internet, and
6    corresponds to one or more IP addresses within a particular range. Domain names are typically strings
7    of alphanumeric characters, with each "level" of the domain delimited by a period, (e.g.,
8    Computer.networklevel11.network12.com). A domain name can provide information about the
9    organization, ISP, and physical location of a particular network user.

10                                    **SUMMARY**

11        12.    In June 2007, the FBI in San Jose, California, initiated an investigation into an
12    alleged Internet fraud scheme being perpetrated by Shawn Dean Hogan, of Digital Point Solutions, and
13    Brian Dunning, of Kessler's Flying Circus, against eBay through eBay's Affiliate program. EBay is the
14    world's largest online marketplace enabling trade on a local, national, and international basis. EBay
15    personnel informed agents of the FBI that, in order to "drive" people to its website, eBay developed an
16    Affiliate program. According to eBay personnel, the Affiliate program is a key marketing enabler,
17    whereby eBay works with third-party marketers to drive Internet traffic to eBay and then be compensated
18    by eBay. The affiliate sends visitors to eBay.com (or any international site of eBay) from a website
19    associated with the affiliate, and does so (in theory) by suggesting (in some way) that the visitor "click"
20    on a link to eBay's website. If these visitors thereafter become new active users on eBay by setting up
21    an account or make a purchase on eBay (within specified time periods), the affiliate will be
22    compensated. The compensation is a tiered payment structure that rewards increased performance. In
23    other words, the more traffic driven by the affiliate to eBay, the more money the affiliate will earn for
24    each transaction or new active user. Compensation is based on the number of new account users or the
25    percentage of the revenue from sales. For instance, if one to forty-nine of the people the affiliate caused
26    to visit eBay became new users, the affiliate would receive $25.00 per new user. Likewise, if the visitors
27    the affiliate caused to visit eBay won a bid for an item costing between $0 and $99.99, the affiliate

28                                        7

1  would receive 50% of the revenue earned by eBay on that transaction. There is an automated tracking

2  infrastructure to confirm that an affiliate who directed a user to eBay and the user returns within a certain

3  time period and wins a bid or makes a purchase will receive compensation.

4          13.    EBay personnel told FBI agents that in order to track this process, when a visitor

5  is referred ro eBay from an affiliate site, eBay "drops" a "cookie" on the visitor's computer so that if the

6  visitor signs up as a new eBay user within 30 days of being directed to eBay by the affiliate, or if the

7  visitor makes a purchase within approximately 7 days of being directed to eBay by the affiliate, the

8  affiliate will receive credit and compensation from eBay under the Affiliate program.

9          14.    Based on my training and experience, I know that a "cookie" is a file that is

10  generated by a website when a user on a remote computer accesses it. The cookie is sent to the user's

11  computer and is placed (or "dropped") on that user's computer, usually in files/folders labeled "Internet"

12  or "Temporary Internet Files." The cookie includes information such as user preferences, connection

13  information such as time and date of use, records of user activity including files accessed or services

14  used, or account information. The cookie is then accessed by the website on subsequent visits to that

15  website by the user in order to better serve the user's particular needs and preferences.

16          15.    According to eBay, the way the cookie works in the eBay Affiliate situation is that

17  the cookie dropped by eBay contains a Publisher Website ID ("PID"), which identifies the Affiliate

18  member that directed the particular user to the eBay site. Therefore, if and when that particular user

19  comes back to eBay in the future, this cookie will be accessed by eBay's system. If that user signs up

20  as a new eBay member within 30 days of the user's initial visit to eBay, or if this user buys on eBay

21  during the user's initial access to the eBay site or during subsequent accesses during a specified period

22  (approximately 7 days), the cookie that is accessed by eBay at that time contains the identifying

23  information (i.e. the PID) of the Affiliate that originally directed the user to eBay. EBay's automated

24  tracking process does the analysis to validate that the originally set cookie and the event cookie (i.e., the

25  cookie that memorializes the registration or purchase event) contain the same PID. This ensures that

26  the affiliate receives the credit and appropriate compensation from eBay through the Affiliate program.

27          16.    EBay advised that, in 2006, it had a total of 32,867 members in the Affiliate

28                                              8

1  program. However, only an average of 5,263 of those members produced at least one transaction in

2  2006. There were 26,266 members in the eBay Affiliate program from January 2007 until June 8, 2007.

3  Approximately 6,083 of those members produced at least one transaction to date in 2007. In 2006, the

4  eBay Affiliate program paid out $70,779,455 in compensation to affiliate members. Digital Point

5  Solutions (which is owned by Shawn Hogan) received $10,489,467 in compensation from the eBay

6  affiliate program in 2006. This was approximately 15% of eBay's total payout. Kessler's Flying Circus

7  (which is owned by Brian Dunning) received $2,696,438 in compensation from eBay's Affiliate program

8  in 2006. From January to April 2007, the eBay Affiliate program paid out $28,440,456 in compensation

9  to affiliate members. During that same time period, Digital Point Solutions earned $4,183,695 in eBay

10 affiliate program compensation; Kessler's Flying Circus earned $2,164,355 in compensation through

11 the program. The top ten affiliates' (not including DPS and Kessler's) average total payout was

12 approximately $3,386,904 per year. Digital Point Solutions owned by Shawn Hogan is the number-one

13 producing eBay Affiliate account in the Affiliate Program, and Brian Dunning's Kessler's Flying Circus

14 eBay Affiliate account is the number-two producing account in the program.

15        17.     EBay personnel also informed agent of the FBI that, in order to be a member of

16 the eBay Affiliate program, a user signs up through an eBay third party vendor named Commission

17 Junction ("CJ") to obtain an eBay affiliate account. CJ's parent company is ValueClick, Inc. EBay uses

18 CJ to register affiliates, assist them with their accounts, and monitor their activity to ensure quality

19 control and compliance with the rules and regulations governing the program. Specifically, the eBay

20 Affiliate Global Program Terms and Conditions states in regard to "tracking tags" that the affiliate user

21 will not deliver any eBay-related cookies or other tracking tags to the computers of the affiliate's user

22 that are merely viewing the affiliate user's advertisements or while the Affiliate user's applications are

23 merely active or open.

24        18.     Further, the eBay Affiliate Global Program Terms and Conditions list the

25 following as a prohibited operation: sending unsolicited information or material to another computer,

26 and/or diverting the user to another site not requested by the user.

27        19.     Accordingly, the Terms and Conditions of eBay's Affiliate program prohibit

28                                        9

1    affiliates from dropping eBay-related cookies on users' computers if those users do not actually "click
2    through" and connect with eBay's website.

3        20.    During the course of its investigation, the FBI also obtained CJ documentation
4    from eBay that indicates CJ also requires its clients to accept the terms of its Publisher or Advertisers
5    Service Agreements (PSA or ASA respectively) before they join. The PSA informs publishers that
6    certain behavior is not acceptable and is grounds for removal from the network, (i.e., generating
7    unwarranted clicks manually or through technology, using undisclosed or inaccurately disclosed
8    software). In CJ's Overview of Network Quality, CJ prohibits "forced clicks" or "cookie stuffing" and
9    defines it as follows: Publisher places a referral cookie without the end user taking an affirmative action
10   (clicking on the link or offer). Multiple forced clicks performed on a single session over a short period
11   of time is referred to as cookie stuffing. Under CJ's agreements, both DPS and Kessler's are
12   "publishers."

13                        **FACTS SUPPORTING PROBABLE CAUSE**
14                        **Digital Point Solutions and Shawn Dean Hogan**

15       21.    Records provided by eBay indicate that Digital Point Solutions ("DPS") joined
16   as an eBay affiliate on December 10, 2003 through eBay's third party Affiliate partner Commission
17   Junction ("CJ"). According to eBay, the DPS affiliate account is the number-one ranked account for
18   performance in the eBay Affiliate program, representing an average of 15% of the eBay U.S. total
19   payment for the Affiliate program in 2006. From January through April 2007, DPS represents an
20   average of 15% of the eBay U.S. total payment for the Affiliate program.

21       22.    Public records from Dun & Bradstreet indicate that DPS began in 1993 and that
22   the owner of the company is Shawn Hogan. DPS is located at 8465 Regents Road, Apartment 448, San
23   Diego, California, 94122, (SUBJECT PREMISES 1) telephone 858-452-3696, website
24   www.digitalpoint.com, DUNS number 94-701-0831 and is in the computer software line of business.
25   DPS recently filed for incorporation in California and was incorporated on May 14, 2007 with
26   registration ID# C2998539.

27       23.    According to California Employment Development Department, there is no record
28                                    10

1  of employment for Shawn Dean Hogan, born September 1, 1975 with the social security account number
2  assigned to Hogan.

3          24.     FBI San Francisco obtained a California Department of Motor Vehicle Driver's
4  License photograph for Shawn Dean Hogan with a listed address of 8465 Regents Road, Apartment 448,
5  San Diego, California, 94122 (SUBJECT PREMISES 1). Records provided by eBay indicate the home
6  address for eBay affiliate Shawn Hogan is 8465 Regents Road, Apartment 448, San Diego, California,
7  94122.

8          25.     Records from T-mobile indicate that Shawn Hogan is the subscriber of cellular
9  telephone 619-723-1589 with a billing address of 8465 Regents Road, Apartment 448, San Diego,
10  California., 92122, home telephone 858-452-3696. Hogan, born September 1, 1975 established this
11  account in December 2006.

12          26.     In June 2006, FBI San Francisco Special Agents interviewed Christine Kim
13  ("Kim"), former employee of CJ and current employee of eBay involved in the Affiliate program. Kim
14  worked at CJ from late 2003 to mid-October 2005. She began as an account representative for the eBay
15  accounts and then became a Program Manager for the eBay Affiliate accounts managed by CJ. Kim
16  managed the top 5 to 10 accounts, which included the accounts for Hogan and Dunning. She indicated
17  that she knows Hogan personally and professionally, and she indicated that he is extremely
18  knowledgeable about computers and computer programming and was involved in developing software.
19  Kim advised agents that Hogan owns and operates his own companies by himself. In the past, Hogan
20  owned and operated a company known as Opti Gold, which Kim believed was involved in database
21  software and software licensing. Kim also stated that Hogan owns a company named Digital Point
22  Solutions, which he operates from his apartment located at 8465 Regents Road, San Diego, California
23  (SUBJECT PREMISES 1). She believed Hogan started DPS five or ten years ago. Kim told FBI agents
24  that Hogan has an Apple MAC Desktop 64, at least two Windows PC desktops that he uses for testing
25  applications related to his businesses, an Apple MAC Power book laptop, a Blackberry Pearl, an XBox,
26  and a webcam at his apartment. Kim also believed that Hogan has a T1 telephone line running into his
27  apartment.

28                                          11

1       27.     Kim advised she is also aware that Hogan houses his servers for DPS at a co-
2   location facility. She is aware that about one year ago, Hogan purchased ten new "blade" servers from
3   Dell Computer for approximately $30,000. Kim is not sure what he did with his already existing Apple
4   servers that she had been told by Hogan were in the co-location facility, i.e., whether he replaced those
5   with the new servers or added the new servers to the existing servers. She believed that Hogan
6   configured the new Dell blade servers at home and was not sure if one server may still be located at the
7   residence. Kim stated that she had been in Hogan's apartment in November 2006 and was positive that
8   Hogan worked from home and most likely remotely accessed his servers from that location. She
9   believed that he had the technical skills to install a quick erase or exit button or reformat of his servers
10  if he believed it was needed for immediate response. She thought he might even be able to do this from
11  his Blackberry phone.

12      28.     Kim indicated that Hogan was considered notorious in the programming world.
13  At one time, she had heard a rumor that he had pirated software applications with a fake "key." She
14  indicated Hogan began a co-operative ad network, but in order to sign up the user had to copy and paste
15  Hogan's codes unto the user's website.

16      29.     Kim advised Hogan created a Digital Point Forum on his website,
17  www.digitalpoint.com which became a best-practices-sharing forum for ad marketing and other tools.
18  For instance, about a year ago, Hogan wrote a tool called "geovisitors" that enables the user of the tool
19  to see where all the visitors to a website are from geographically on a map. Kim believed Hogan did this
20  by using an image tag. Hogan had told Kim that the first time a visitor clicked on his "geovisitors" tool
21  the visitor would see an eBay advertisement and apparently visitors complained about it. Hogan also
22  told Kim that he had designed self-optimizing algorithms so that when a visitor clicked on a link, he
23  could obtain demographics to tailor his ad links. Kim advised that Hogan has developed an extremely
24  powerful ad network, which is a massive network of advertisers that provide linkage to other members
25  and websites.

26      30.     Based on investigation by the FBI, there are other tools that are available for
27  download from www.digitalpoint.com (e.g., website-country, fmdigger, zone-transfer, keywords, ad

28                                  12

1  network, and coop ads/dp coop) which may also be perpetuating this cookie stuffing scheme. From May

2  29, 2007 through June 4, 2007, there was a discussion thread on forums.digitalpoint.com in which a

3  participant in the thread was inquiring as to whether ad network and/or coop ads was forcing clicks and

4  dropping cookies with publisher information for Digital Point Solutions on visitors' machines. Another

5  participant responded, "Shawn is getting plenty of eBay affiliate revenue if this is true."

6           31.     Kim told agents that Hogan knows Dunning and had told her that Dunning stole

7  his tool "geovisitors." Kim indicated that Dunning had developed a tool named "profilemaps" that

8  Dunning developed for use on www.myspace.com. Kim indicated that an eBay logo appears with a

9  button on the "profilemaps" tool, Hogan told her that this tool Dunning created was like his

10  "geovisitors" tool.

11                          **Location of Hogan's Servers**

12           32.     Through public source tracking using Network Solutions, agents were able to

13  resolve the domain name www.digitalpoint.com and a home website www.shawnhogan.com to the

14  Internet Protocol (IP) address range 216.9.35.48 through 216.9.35.63.    through public source

15  information, these IP addresses were traced to NetHere, Inc. which is a co-location facility and web

16  hosting service provider located at 4134 Voltaire Street, San Diego, California, 92107. NetHere, Inc.

17  provides web-hosting, E-Commerce, Internet Access, Network services and co-location facilities.

18                  **Report Regarding Suspicious Cookie Activity by DPS in 2004/2005**

19           33.     Kim advised that while she was employed by CJ, sometime between late 2004

20  and early 2005, she received information about possible fraudulent activity on Hogan's DPS eBay

21  affiliate account from Ben Kopetti who was the compliance manager for CJ. Kim indicated that Kopetti

22  had received information regarding this activity from an outside contractor, Ben Edelman. Edelman

23  performed quality control for eBay and eBay's Affiliate program through CJ by providing monthly

24  reports of possible fraudulent activity. Edelman reported that Hogan's DPS eBay affiliate account had

25  cookie-like behavior. Because Kim was Hogan's/DPS's account manager at CJ, Kopetti provided Kim

26  the details and a copy of Edelman's report. Kim decided to talk directly to Hogan about the matter, since

27  Hogan would contact her a few times a week and explain what he was doing with his advertisements and

28                                          13

1    how he was attracting traffic. When Kim approached Hogan about the matter, he explained that it was
2    just a small scripting error and that he would fix it immediately. Kim advised that Hogan was apologetic
3    and was quick in resolving the issues. Nothing further was reported to Kim regarding this matter, and
4    she believed that Hogan must have fixed the errors.

5           34.     It should be noted that eBay personnel advised FBI agents Ben Edelman is an
6    outside contractor for eBay who provides monthly reports regarding the activities of eBay affiliates to
7    the person running quality control for the eBay Affiliate program. This monthly report is then forwarded
8    by eBay to the CJ compliance person. The purpose is to have CJ duplicate Edelman's efforts and
9    provide warnings, sanctions, and/or suspensions to the eBay affiliates participating in any fraudulent
10   activity. In looking for fraud, Edelman casts his net very wide, and Edelman's reports contain
11   descriptions of some activities by eBay affiliates that can be described as "gray" (i.e., not clearly "black"
12   or "white") and that eBay might not consider a violation per se of the Affiliate program terms and
13   conditions (e.g., cloaking redirects).[4]

14                       **Report of Possible DPS Fraudulent Activity in January 2006**

15          35.     According to Kim (who was given this information by Dan Burkhart, the head
16   of eBay's Affiliate program, when Kim was supervised by Burkhart), in January 2006, Burkhart received
17   a telephone message from a person later identified as Todd Dunning who indicated that he knew of a

18

19       [4] Cloaking is a technique used by some web sites to deliver one page to a search engine for
20   indexing while serving an entirely different page to everyone else. There are opposing views as to
21   whether or not cloaking is ethical. Opponents see it as a bait-and-switch, where a Web server is scripted
22   to look out for search engines that are "spidering" in order to create an index of results. The search
23   engine thinks it is selecting a prime match to its requests based on the meta tags that the site
24   administrator has input. However, the search results is misleading because the meta tags do not
25   correspond to what actually is on the page. Some search engines, such as Lycos, Hotbot, and Excite,
26   even ban cloaked Web Sites. Proponents of cloaking assert cloaking is necessary in order to protect the
27   meta data, as only the spider is supplied with the meta tags.

28                       14

USA00637

1   person who was blatantly cheating on the eBay Affiliate program and bragging to Todd Dunning's

2   brother (Brian Dunning) about all of the money he was making by placing a 1x1 pixel and forcing an

3   eBay cookie with his affiliate information. Burkhart then contacted Todd Dunning, who told him that

4   the person committing the fraud was Shawn Hogan who owns Digital Point Solutions. According to

5   Todd Dunning, Hogan was using a 1x1 pixel to force a cookie to be placed with his affiliate information,

6   even though the user did not click to redirect to the eBay site.

7           36.     After receiving this telephone call, eBay personnel asked eBaty's outside

8   contractor, Ben Edelman, to check out Hogan's DPS affiliate traffic. Edelman did not find anything at

9   that time, but he did recall reporting an activity similar to what was described in a prior report months

10  before, and he felt it would be very difficult to detect again. Kim, who was then working for eBay with

11  the Affiliate program, talked with Edelman about the prior incident from late 2004/early 2005 and the

12  telephone call from Todd Dunning in January 2006. Kim advised FBI agents that Edelman told her that

13  he did not think that the activity he discovered regarding Hogan when he wrote the initial report would

14  have been a scripting error. However, since Edelman could not find anything suspicious regarding

15  Hogan's traffic after eBay received the telephone call from Todd Dunning, eBay determined that Todd

16  Dunning's complaint was most likely the result of competitive fighting between Todd and/or Brian

17  Dunning and Hogan, who were believed to know each other.

18          **Report Regarding Possible DPS Fraudulent Activity in May 2007**

19          37.     In May 2007, Compliance Specialist David Lam of CJ's United Kingdom office

20  notified Kim with the eBay Affiliate program and Jennifer Burnett, Program Quality Manager, CJ United

21  States, that the eBay affiliate Digital Point Solutions ("DPS") was forcing clicks[5] by users and therefore

22  cookie stuffing[6] in order to fraudulently obtain commissions and compensation from eBay. This time,

23

24

25          [5] Commission Junction's Overview of Network Quality defines a "forced click" as the placement

26  of a referral cookie without the end user taking an affirmative action (clicking on the link or offer).

27          [6] Commission Junction's Overview of Network Quality defines "cookie stuffing" as multiple

                                                                                          (continued...)

28                                              15

1     after some investigation, eBay technical staff were able to duplicate the cookie-stuffing process from
2     the screen shots provided by CJ United Kingdom of Hogan's DPS account provided by CJ. The eBay
3     technical staff also initiated an investigation into Dunning's activities as result of being able to validate
4     the fraud from Hogan's account and were able to validate similar cookie-stuffing behavior from
5     Dunning's Kessler's Flying Circus account. A description of the steps taken by eBay in investigating
6     this fraudulent activity is set out in the sections titled, "Technical Analysis of the Fraudulent Activity"
7     and "Installation of a Trip-Wire" below.

8                  **Kessler's Flying Circus and Brian Dunning**

9         38.     According to information provided to the FBI by eBay personnel, Brian Dunning
10     joined as an eBay affiliate on November 11, 2004 through CJ using www.briandunning.com. EBay
11     indicated that this affiliate account used by Dunning was a lower-tiered account that eBay does not
12     believe was involved in this fraudulent activity involving cookie-stuffing utilizing a 1x1 pixel to force
13     access to eBay's homepage without the user's knowledge. EBay indicated that while this account does
14     not appear to be involved in the current scheme involving the 1x1 pixel, the account has certainly had
15     other suspicious activity flagged.

16         39.     EBay personnel also advised FBI agent that Dunning later set up an eBay affiliate
17     account through CJ under the name Kessler's Flying Circus ("Kessler's") on April 22, 2005, which
18     became the second-ranked account for performance in the eBay Affiliate program. Kessler's
19     compensation in the eBay Affiliate program represented 3% of the total U.S. payment for the Affiliate
20     program in 2006. From January to April 2007, Kessler's compensation in the program represented 7%
21     of the eBay total U.S. payment.

22         40.     Public records indicate that Brian Dunning may be operating under the possible
23     fictitious business name Kesslers Flying Circus, located at 15 High Bluff, Laguna Niguel, California,
24     92677 (SUBJECT PREMISES 2). The file date was April 15, 2005, file number 20056025410 in the

25

26

27     <sup>6</sup>(...continued)
      forced clicks performed on a single session over a short period of time.

28                            16

1  State of California, and the owner is listed as Brian Dunning at 15 High Bluff, Laguna Niguel,
2  California, 92677.

3              41.    Records from the California Employment Development Department indicate that
4  Brian A. Dunning, born December 29, 1965, with a social security account number assigned to Dunning,
5  was employed by Thunderwood Holdings, Inc., located at 20 Cresta Blanca, Orinda, California, 84563,
6  telephone 925-368-7441 in the first through the fourth quarters of 2006 and in the first quarter of 2007.
7  According to public source records, Thunderwood Holdings, Inc. was incorporated in the State of
8  California on December 9, 2002 and the status is active. The registered agent is Brian Andrew Dunning
9  at 15 High Bluff, Laguna Niguel, California, 92677. Brian Andrew Dunning is also listed as the
10 President located at the same address (SUBJECT PREMISES 2).

11             42.    FBI San Francisco obtained a California Department of Motor Vehicle Driver's
12 License photograph of Brian Andrew Dunning with a listed address of 15 High Bluff, Laguna Niguel,
13 California, 92677. Records provided by eBay indicate the home address for eBay affiliate Brian
14 Dunning is 15 High Bluff, Laguna Niguel, California, 92677 (SUBJECT PREMISES 2).

15             43.    Kim also knows Dunning from her employment at CJ. She managed Dunning's
16 eBay affiliate account while at CJ. She is aware that Dunning has worked on software development and
17 is also fairly knowledgeable in regard to computer programming, although he is not as technical as
18 Hogan. Kim told FBI agents that Dunning works from home. Kim had heard the Dunning has his sister
19 helping him detect and remove pornography from his sites and may have another engineer helping him
20 with enhancements to www.wholinked.com. Kim indicated that Hogan and Dunning knew each other
21 and Hogan gave Dunning ideas. She believes it is possible that Hogan would have told Dunning about
22 Hogan's use of the cookie-stuffing scheme using the 1x1 pixel.

23             44.    Kim recalled that, while she was employed by CJ and managing Dunning's
24 affiliate account, the account had some strange behavior similar to a mouse-movement-induced redirect
25 to eBay. Kim indicated after she asked Dunning about this activity, the activity stopped. She indicated
26 that Dunning resided in Laguna Niguel, California and possibly in Alieso Viejo, California before that.
27 Kim also advised Dunning had created a widget called "wholinked.com," which he posted for use on

28                                         17

1  blogs that was designed to provide the user a list of sites linked to your site. In addition, Kim indicated

2  Dunning also created a tool called "profilemaps" that maps everyone who visits your profile on

3  www.myspace.com. This tool can be obtained at the domain profilemaps.info.

**Location of Dunning's Servers**

5  45.  Through public source tracking using Network Solutions, agents were able to

6  resolve the domain name for www.briandunning.com, www.thunderwood.com, www.wholinked.com

7  and profilemaps.info to a web hosting service provider named www.rackspace.com located at 9725

8  Datapoint Drive, Suite 100, San Antonio, Texas, 78229 (SUBJECT PREMISES 3). A web hosting

9  service provider is in the business of providing server space, web services, and file maintenance for

10  websites controlled by individuals or companies that do not have their own web servers. Many ISPs,

11  such as America Online, will allow subscribers a small amount of server space to host a personal web

12  page. Other commercial ISPs will charge the user a fee depending on the complexity of the site being

13  hosted. Additionally, the IP addresses associated with these domains are 72.32.11.26 and 72.32.102.215,

14  which are also, according to ARIN[4], resolved to www.rackspace.com.

15  46.  Based on my experience and training, I know that individuals conducting illegal

16  and fraudulent activities can use web hosting services in order to distance themselves from the criminal

17  activity. Web hosting service providers may have many servers located in several areas not physically

18  near the user accessing these services, which may make it more difficult for law enforcement to find

19  where the computer files and evidence of crime are stored. In this case, Dunning resides in Laguna

20  Niguel, California, and it appears that the web hosting services he is using to host his websites

21  www.briandunning.com, www.wholinked.com, and profilemaps.info are provided by a company located

22  in San Antonio, Texas.

23  47.  Further, I know that individuals and/or companies that utilize web hosting and

24  co-location facilities typically access these facilities remotely to work from their offices or a home office

25

26  [4] ARIN is the American Registry for Internet Numbers. ARIN is a non-profit corporation that

27  allocates Internet Protocol resources in the United States and Canada.

28

18

USA00641

1   if they live in a different location than the server facility. In this manner, computer files, records and
2   other evidence of crimes committed through computer servers may be located on the servers of the web-
3   hosting company or in the co-location facility, or on the computers in the office or home office of the
4   person remotely accessing these servers.

5         48.    AT&T records indicate that Dunning has an active account with DSL Internet
6   service using a dynamic IP address. This account is billed to him at 15 High Bluff, Laguna Niguel,
7   California, 92677 which began in March 2003. Based on my training and experience, I know that the
8   Internet can be used to connect to web hosting service providers who are physically located in a
9   different city than the city where the user resides and/or works.

10  **Possible Cookie Stuffing/Forced Clicks by Affiliates Associated with Dunning**

11        49.    In Edelman's monthly report dated February 5 to February 27, 2007, indicated
12  activity of cookie stuffing by www.wholinked.com. This report indicated the affiliate at
13  www.wholinked.com was using JavaScript embedded in third parties' sites to force clicks on eBay
14  affiliate links in 1x1 pixel images. In this report, Edelman indicated that, in investigating the matter, he
15  had loaded www.dnainvestments.com on a clean computer. In his report, Edelman indicated he was
16  surprised to see that it dropped an eBay cookie without his clicking on any link to eBay. Edelman's
17  reports further stated that packet log analysis showed that traffic flowed as follows: From
18  www.dnainvestments.com to www.passportinvestor.com which embedded a JavaScript called
19  "wholinked.com/wordpress.js," which set out a 1x1 pixel image tag that redirected to a CJ affiliate link
20  (PID 1740639). Edelman also stated in this report that this PID is one he reported in August 2006 for
21  a web of web spam sites that also perform cookie stuffing. PID 1740639 belongs to Dunning's Kessler's
22  account.

23        50.    In his August 2006 report, Edelman described conducting a general cookie-
24  stuffing test. Edelman searched "eBay registration" at MSN. He found that result number 14 was
25  www.hacth2008.org/ebay/ebay registration.php. Upon clicking through to this page, Edelman was
26  immediately taken directly to the eBay website via an affiliate link: www.qksrv.net/click-1673599.
27  Edelman indicated this is standard cookie stuffing by invoking an affiliate link and setting affiliate

28                                 19

1  pixel with the file extension "GIF"[5] then loads onto that user's computer. The pixel file goes through

2  a "gating" function in which a computer script checks for various conditions before it executes. For

3  instance, eBay has determined that the gating function determines the IP address of the user. If the IP

4  address is one that is associated with eBay or CJ, then nothing occurs and the process ends. Similarly,

5  eBay has determined that there is a frequency cap that prevents execution if the user has been to the site

6  before. If these criteria are successfully met (i.e., the user's IP address is not associated with either eBay

7  or CJ and the user has not been to the site before), then the pixel executes and calls the Affiliate's server

8  (e.g., www.digitalpoint.com). A redirect to the Affiliate server is then initiated. Another redirect occurs

9  to http://rover.eBay.com to pull an eBay homepage in text thereby simulating a click redirect (but the

10  eBay home page does not load on the user's computer). Then a server at www.eBay.com sends the

11  cookie with the Affiliate's PID to the user's computer even though the user never clicked to be

12  redirected to www.eBay.com nor ever left the original website associated with the affiliate. Now, this

13  user has a cookie from eBay set on the user's computer that contains the affiliate PID of DPS. If this

14  user thereafter goes to www.eBay.com (either directly or from another eBay affiliate's site) and sets up

15  a user account or makes a purchase within a specified time period, DPS will be compensated by eBay.

16  DPS would have obtained this compensation fraudulently because placing cookies on user's computers

17  in this fashion violates the terms and conditions of the Affiliate program because the user never actually

18  "clicked through" to eBay at the time that DPS caused the initial cookie to be placed on that user's

19  computer.

20       54.       According to eBay personnel, the technical team at eBay determined that this 1x1

21  pixel is placed on sites linked to Hogan's Digital Point Solutions ad-network. The eBay technical team,

22  based on their analysis, believe that any site that downloaded any of Hogan's free tools from his website

23  www.digitalpoint.com will have the 1x1 pixel on that website. Hogan's free tools include geovisitors,

24  ad-network and others. It appears as though the 1x1 pixel GIF file has a different name for each website

25

26       [5] Gif stands for graphics interchange format which is a bit-mapped graphics file format used by

27  the World Wide Web, Compuserve and many Bulletin Board Systems.

28                                        21

1   but that each GIF calls to Hogan's servers at http://www.digitalpoint.com, to include but not limited to

2   http://ads.digitalpoint.com or http://forums.digitalpoint.com each time the GIF passes the gating function

3   and executes. Based of their technical analysis, the eBay technical team has told FBI agents that they

4   believe the GIF which is executing and redirecting to Hogan's company website www.digitalpoint.com

5   pulls up a "script" that causes the cookie-stuffing.

6         55.   As mentioned previously, the company Digital Point Solutions is assigned a range

7   of IP addresses 216.9.35.48 through 216.9.35.63. The website www.shawnhogan.com points to a URL

8   with an IP address within the range of IP addresses assigned to Digital Point Solutions. The website

9   www.digitalpoint.com also points to a URL that resolves within the range of IP addresses assigned to

10   Digital Point Solutions. According to the eBay technical team every time the 1x1 pixel executes, a

11   redirect occurs to some part/section of www.digitalpoint.com, (i.e., http://forums.digitalpoint.com,

12   http://ads.digitalpoint.com , http://geo.digitalpoint.com , http://www.digitalpoint.com/tools/geovisitors).

13   In my training and experience, websites can reference and refer to other URLs which could correspond

14   to other IP addresses (e.g., another IP address within the range of IP addresses assigned to the company).

15         56.   After duplicating the cookie stuffing being done by Hogan's DPS account, the

16   eBay technical team also initiated an investigation into Dunning's Kessler's affiliate account and proved

17   similar cookie-stuffing activity. In summary, eBay determined that a user who downloads Dunning's

18   tool has a similar cookie placed on the user's computer, even though the user never actually "clicked

19   through" or viewed eBay's website. This cookie setting by Dunning's tool created the same result for

20   Kessler's affiliate account as the cookie setting performed by Hogan's DPS affiliate account. The eBay

21   technical team determined that the cookie-stuffing activity stems from a tool named profilemaps.info.

22   This tool calls forth a 1x1 pixel which ends in the extension "GIF." Similarly to the DPS activity, this

23   GIF loads and redirects to eBay where a cookie is then dropped with Dunning's Kessler's affiliate PID.

24   The eBay technical team told FBI agents that profilemaps.info will force a stuffed cookie to be loaded

25   if the user downloads the actual tool or if the user accesses a myspace homepage in which that user had

26   downloaded the tool created by Dunning called profilemaps.info.

27         57.   In addition, the eBay technical team told FBI agents that a user who downloads

28                         22

USA00644

1   a tool created by Dunning (located at www.wholinked.com) will have a 1x1 pixel (which ends in the
2   extension "GIF") execute and cause what appears to be a redirection to eBay.com which then forces a
3   cookie to be stuffed and loaded on the user's computer with the PID from Dunning's Kessler's account.
4   As mentioned above, profilemaps.info points to a URL associated with IP address 72.32.102.215. The
5   domain names www.thunderwood.com and www.briandunning.com resolve to the same IP address.
6   Both of these domains are registered to Brian Dunning at 15 High Bluff, Laguna Niguel, California,
7   92677 and he is listed as both the technical and administrative contact for these domains at 9258-368-
8   7441 or brian@briandunning.com. The IP address has been traced to a web hosting service provider in
9   San Antonio, Texas named Rackspace Managed Hosting. Similarly, www.wholinked.com has been
10  traced to IP address 72.32.11.26 which is also serviced by Rackspace Managed Hosting.

11          58.     Based on my training and experience, individuals who are committing fraud or
12  attempting to deceive use multiple websites to initiate and perpetuate their fraud. In this investigation,
13  it appears that Dunning is utilizing two tools profilemaps.info and www.wholinked.com, which appear
14  to be at two different IP addresses that also hosts other domains which are linked to Dunning. This
15  investigation has discovered several domains and websites used by the subject wherein it appears they
16  are not directly related on the surface (i.e., www.thunderwood.com). However, it is very likely given
17  that these sites may also contain the information sought. For instance, profilemaps.info points to a URL
18  which goes to the same IP address as www.thunderwood.com, and www.briandunning.com and both
19  of these domains are registered and serviced technically by Dunning. Therefore, Dunning could place
20  various parts of the computer code which makes the tool profilemaps.info operate anywhere within
21  either of these websites or in other folders/files on the servers that host that IP address. The same is true
22  for the tool www.wholinked.com.

23          **Confirmation fo the Fraudulent Activity by Installation of "Trip-wire"**

24          59.     EBay personnel informed FBI agents that, on June 7, 2007 at approximately noon,
25  eBay technical staff installed a "trip-wire" to determine fraudulent traffic. The trip-wire finished rolling
26  out globally at 6:42 p.m. on June 7, 2007. The goal of eBay's trip-wire analysis was to conclusively
27  determine that certain Affiliates (specifically, those associated with Hogan and Dunning) were falsely

28                                              23

1  taking credit for "driving traffic" (defined as Internet users who come to eBay) and for subsequent

2  revenue events and, thus, fraudulently getting paid out on a percentage of revenue that occurred as a

3  result of this traffic. As described in more detail above, it appeared to eBay that these Affiliates were

4  falsely taking credit for driving this traffic by having their computer programs mimic users coming to

5  the eBay site by marking the users' machines with a tag ("cookie stuffing") that is used by eBay to give

6  Affiliates credit for these events. However, when this fraudulent activity occurs, the users never actually

7  came to the eBay.com homepage (www.ebay.com) and never saw the images that are viewed by humans

8  on the page.

9          60.    In order to establish that Hogan's and Dunning's Affiliates were performing this

10  type of cookie stuffing, eBay installed a "trip-wire." The trip-wire that eBay installed was a special

11  image on eBay's home page that allowed eBay to evaluate every visit to www.ebay.com

12  <http://www.ebay.com/> and to identify if the special image on the page was actually viewed by a

13  human (i.e., whether the image was actually loaded unto a computer screen for display). If the visit

14  showed that a request was made to www.ebay.com <http://www.ebay.com/> without this image being

15  shown, eBay then knew that a machine made this request to the home page merely for the purpose of

16  getting eBay's servers to serve up a "cookie" and a human did not actually view the page. Ebay was able

17  to decipher which Affiliate drove this false traffic based on the PID contained in the cookie which was

18  set by eBay. The evidence obtained by eBay showed that a vast majority of the traffic driven to

19  www.ebay.com <http://www.ebay.com/> by Hogan's and Dunning's Affiliates did not have this special

20  image viewed and thus, was a machine making these requests.

21          61.    The trip-wire is set up to collect the date and time, the IP address of the user

22  receiving the cookie, and the affiliate PID, among other information. EBay utilizes a third party IP

23  lookup table to map the Country and/or State from which the user that is receiving the stuffed cookie

24  is located.

25          62.    An analysis of the trip-wire by eBay indicates that on June 8, 2007, 97% of the

26  traffic directed from Hogan's DPS account was fraudulent in that the special image was not accessed.

27  On June 9, 2007, 98% of the traffic directed from Hogan's DPS account was fraudulent. On both June

28                                                    24

1  8th and 9th, 2007, 98% of Dunning's traffic from his Kessler's account was fraudulent. Below are a few

2  examples of the traffic directed from Hogan's and Dunning's accounts:

3       63.    On June 7, 2007, at approximately 12:33:17:82, the trip-wire captured a cookie

4  stuffed with information for the affiliate using PID 2225635 being sent from the eBay San Jose server

5  to IP address 82.56.96.207.  The user of this IP is located in Michigan.  PID 2225635 is assigned to

6  Hogan's DPS account.

7       64.    In June 8, 2007, at approximately 12:52:40:72, the trip-wire captured a cookie

8  stuffed with information for the affiliate using PID 2028993 being sent from the eBay San Jose server

9  to IP address 172.174.248.28 which resolves to a customer utilizing the ISP America Online located in

10  Virginia.  PID 2028993 is assigned to Dunning's Kessler's account.

11       65.    On June 8, 2007, at approximately 12:58:17:00, the trip-wire captured a cookie

12  stuffed with information for the affiliate using PID 2225634 being sent from the eBay San Jose server

13  to IP address 68.57.17.17.  The user of this IP address is located in Pennsylvania.  PID 2225634 is

14  assigned to Hogan's DPS account.

15       66.    On June 9, 2007, at approximately 12:05:03:90, the trip-wire captured a cookie

16  stuffed with information for the affiliate using PID 2326993 being sent from the eBay San Jose server

17  to IP address 87.74.32.80.  The user of this IP address is located in England.  PID 2326993 is assigned

18  to Dunning's Kessler's account.

19       67.    On June 9, 2007, at approximately 12:56:10:87, the trip-wire captured a cookie

20  stuffed with information for the affiliate using PID 2225635 being dropped by the eBay San Jose server

21  on IP address 71.210.107.53.  The user of this address is located in Arizona.  PID 2225635 is assigned

22  to Hogan's DPS account.

23       68.    On June 10, 2007, at approximately 18:36:38:97, the trip-wire captured a cookie

24  stuffed with information for the affiliate using PID 2225634 being dropped from the San Jose server on

25  IP address 203.101.184.6.  The user is located in Pakistan.  PID 222634 is assigned to Hogan's DPS

26  account.

27       69.    On June 11, 2007, at approximately 12:18:31:84, the trip-wire captured a cookie

28       25

1 | stuffed with information for the affiliate using PID 2225634 being dropped by the San Jose server on
2 | IP address 206.40.234.218. The user of this IP address is located in Utah. PID 2225634 is assigned to
3 | Hogan's DPS account.

4 |          70.    On June 11, 2007, at approximately 12:23:44:06, the trip-wire captured a cookie
5 | stuffed with information for the affiliate using PID 2326993 being dropped by the San Jose server on
6 | IP address 88.105.18.148. The user of the IP address is located in Essex, England. PID 2326993 is
7 | assigned to Dunning's Kessler's account.

8 |          71.    All of these cookies were dropped by an eBay server located in San Jose,
9 | California. Each of these cookies was sent to a computer assigned an IP address that is geographically
10 | located (according to eBay and their third party vendors ) either in a state other than California or in a
11 | country other than the United States. Moreover, eBay's information regarding these users indicates that
12 | each of the users resides outside of California. Accordingly, each of these cookies was sent by means
13 | of wire communication over the Internet in interstate or foreign commerce. Further, each of these wire
14 | communications was in furtherance of either Hogan's or Kessler's scheme to defraud because, if the user
15 | receiving the cookie goes to eBay within specified time periods and either registers as a new user with
16 | eBay or makes a purchase, Hogan or Kessler will receive payment from eBay pursuant to eBay's
17 | Affiliate program, even though the user in question had not actually "clicked through" to eBay from
18 | websites that were part of Hogan's or Kessler's network when each of the cookies described above was
19 | sent out from eBay's server . Accordingly, even if the user independently went to eBay or went to eBay
20 | from another affiliate and either registered or bought and item, Hogan and Dunning would receive credit
21 | for that event.

22 |                              **Analysis of Fraud Prior to Trip-Wire**

23 |          72.    EBay was able to provide data that indicates the fraudulent cookie stuffing began
24 | much further back than when the trip-wire began. For instance, eBay has reported that for Hogan's DPS
25 | account with PID 2225635, from December 2006 until May 2007, approximately 97% of the sessions
26 | allegedly directed by this affiliate PID never went beyond the "landing page." The "landing page" is the
27 | first page that a user goes to on a web site. Based on eBay's analysis of eBay's users' patterns of

28 |                                          26

1  activity, this is an extremely high percentage. That is, commonly a much greater number of people who
2  "click through" to eBay's website from an affiliate would be expected to click on one or more links on
3  eBay's homepage or perform a search for an item, whether or not that user ever actually registered with
4  eBay or bought an item. For Hogan's DPA account with PID 2225634, for the same time period,
5  approximately 96% of the sessions never go beyond the landing page. Dunning's Kessler's account with
6  PIDs 2028993, and 2326993, from March 2007 through May 2007, approximately 96% of the sessions
7  never go beyond the landing page. The eBay statistics also reflect that DPS has a very large number of
8  sessions with only eBay server events wherein the user never gets to the landing page (actual homepage
9  for eBay.com).

10                              **COMPUTER SEARCH PROTOCOL**

11              73.    With the approval of the Court in signing this warrant, agents executing this
12  search warrant will employ the following procedures regarding computers that may be found on the
13  premises which may contain information subject to seizure pursuant to this warrant:

14                              Forensic Imaging

15         a.    After securing the premises, the executing agents will consult with a computer specialist
16  to determine the feasibility of obtaining forensic images of electronic storage devices while on-site. The
17  feasibility decision will be based upon the number of devices, the nature of the devices and the volume
18  of data to be imaged. The preference is to image on-site if it can be done in a reasonable amount of time
19  and without jeopardizing the integrity of the data and the safety of the agents. The number and type of
20  computers and other devices and the number, type, and size of hard drives are of critical importance.
21  It can take several hours to image a single hard drive — the bigger the drive, the longer it takes. As
22  additional devices and hard drives are added, the length of time that the agents must remain on-site can
23  become overly intrusive, dangerous, and impractical.

24         b.    If it is not feasible to image the data on-site, the computer equipment and any peripherals
25  will be seized and transported off-site for imaging. Once a verified image has been obtained, the owner
26  of the equipment will be notified and the equipment returned within thirty (30) days of seizure absent
27  further application to this court.

28                                        27

USA00649

c.     A forensic image is an exact physical copy of the hard drive or other media. It is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant. A forensic image captures all of the data on the hard drive or other media without the data being viewed and without changing the data in any way. This is in sharp contrast to what transpires when a computer running the common Windows operating system is started, if only to peruse and copy data — data is irretrievably changed and lost. Here is why: When a Windows computer is started, the operating system proceeds to write hundreds of new files about its status and operating environment. These new files may be written to places on the hard drive that may contain deleted or other remnant data. That data, if overwritten, is lost permanently. In addition, every time a file is accessed, unless the access is done by trained professionals using special equipment, methods and software, the operating system will re-write the metadata for that file. Metadata is information about a file that the computer uses to manage information. If an agent merely opens a file to look at it, Windows will overwrite the metadata which previously reflected the last time the file was accessed. The lost information may be critical.

d.     Special software, methodology, and equipment is used to obtain forensic images. Among other things, forensic images normally are "hashed," that is, subjected to a mathematical algorithm to the granularity of 1038 power, an incredibly large number much more accurate than the best DNA testing available today. The resulting number, known as a "hash value" confirms that the forensic image is an exact copy of the original and also serves to protect the integrity of the image in perpetuity. Any change, no matter how small, to the forensic image will affect the hash value so that the image can no longer be verified as a true copy.

                              Forensic Analysis

e.     After obtaining a forensic image, the data will be analyzed. Analysis of the data following the creation of the forensic image is a highly technical process that requires specific expertise, equipment and software. There are literally thousands of different hardware items and software programs that can be commercially purchased, installed and custom-configured on a user(s computer system. Computers are easily customized by their users. Even apparently identical computers in an office environment can

28

1   be significantly different with respect to configuration, including permissions and access rights,
2   passwords, data storage and security. It is not unusual for a computer forensic examiner to have to
3   obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

4        f.     Analyzing the contents of a computer, in addition to requiring special technical skills,
5   equipment and software also can be very tedious. It can take days to properly search a single hard drive
6   for specific data. Searching by keywords, for example, often yields many thousands of "hits," each of
7   which must be reviewed in its context by the examiner to determine whether the data is within the scope
8   of the warrant. Merely finding a relevant "hit" does not end the review process. As mentioned above,
9   the computer may have stored information about the data at issue: who created it, when it was created,
10  when was it last accessed, when was it last modified, when was it last printed and when it was deleted.
11  Sometimes it is possible to recover an entire document that never was saved to the hard drive if the
12  document was printed. Operation of the computer by non-forensic technicians effectively destroys this
13  and other trace evidence. Moreover, certain file formats do not lend themselves to keyword searches.
14  Keywords search text. Many common electronic mail, database and spreadsheet applications do not
15  store data as searchable text. The data is saved in a proprietary non-text format. Microsoft Outlook data
16  is an example of a commonly used program that stores data in a non-textual, proprietary manner;
17  ordinary keyword searches will not reach this data. Documents printed by the computer, even if the
18  document never was saved to the hard drive, are recoverable by forensic examiners but not discoverable
19  by keyword searches because the printed document is stored by the computer as a graphic image and not
20  as text. Similarly, faxes sent to the computer are stored as graphic images and not as text.

21       g.     Analyzing data on-site has become increasingly impossible as the volume of data stored
22  on a typical computer system has become mind-boggling. For example, a single megabyte of storage
23  space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000
24  megabytes, is the equivalent of 500,000 double-spaced pages of text. Computer hard drives are now
25  capable of storing more than 100 gigabytes of data and are commonplace in new desktop computers.
26  And, this data may be stored in a variety of formats or encrypted. The sheer volume of data also has
27  extended the time that it takes to analyze data in a laboratory. Running keyword searches takes longer

28  29

1    and results in more hits that must be individually examined for relevance. Even perusing file structures
2    can be laborious if the user is well-organized. Producing only a directory listing of a home computer
3    can result in thousands of pages of printed material most of which likely will be of limited probative
4    value.

5        h.    Based on the foregoing, searching any computer or forensic image for the information
6    subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take
7    weeks or even months. Keywords need to be modified continuously based upon the results obtained;
8    criminals can mislabel and hide files and directories, use codes to avoid using keywords, encrypt files,
9    deliberately misspell certain words, delete files, and take other steps to defeat law enforcement. In light
10   of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably
11   appear necessary to locate and retrieve digital evidence within the scope of this warrant.

12       i.    All forensic analysis of the imaged data will be directed exclusively to the identification
13   and seizure of information within the scope of this warrant.

## CONCLUSION

15       74.    Based upon the information above, I have probable cause to believe that evidence,
16   contraband, fruits, and/or instrumentalities of violations of Title 18, United States Code, Section 1343,
17   (wire fraud) exists at the applicable SUBJECT PREMISES as set forth in more detail in Attachment B.

18       75.    In summary, there is probable cause to believe that Hogan has committed wire
19   fraud by utilizing computers at his residence and/or in conjunction with computers and/or servers
20   associated with his business Digital Point Solutions. There is probable cause to believe that Hogan has
21   created several free computer tools that are available to be downloaded from his web sites
22   www.digitalpoint.com and www.shawnhogan.com which infect the visitor with a 1x1 pixel containing
23   an unknown script that in turn places a cookie stuffed with Hogan's eBay DPS account affiliate
24   information. It is believed that approximately 97% of Hogan's DPS affiliate directed traffic to eBay is
25   fraudulent. Hogan has been paid approximately $28 million by eBay. Hogan is allegedly computer
26   knowledgeable in regards to software development and languages and works from his residence
27   (SUBJECT PREMISE 1) where he has a least two windows PCs which he utilizes for "testing" and

28                                    30

1  several other MAC computers. His web sites are hosted by a co-location facility with web hosting
2  services named NetHere and there is probable cause to believe that the tools which are downloaded and
3  contain the 1x1 pixel with script that forces the cookie stuffing is located on these servers. In all of the
4  tests done to validate the cookie stuffing explained above, the 1x1 redirects to Hogan's website
5  www.digitalpoint.com unbeknownst to the user.

6        76.  Similarly, there is probable cause to believe that Dunning committed wire fraud.
7  Dunning has created free computer tools which are downloadable, www.wholinked.com and
8  profilemaps.info, which are linked by IP address to his website www.briandunning.com and
9  www.thunderwood.com. All of the domains and IPs from which Dunning's free computer tools may
10  be accessed are located on the servers of Rackspace.com (SUBJECT PREMISE 3) which are located
11  in San Antonio, Texas. Dunning owns his own businesses and works from his residence (SUBJECT
12  PREMISE 2). Dunning is also involved in computer programing and software and there is probable
13  cause to believe he might be working on, testing, and revising script from his computers at his residence.
14  It is believed that approximately 96% of the traffic Dunning directs from his Kessler's affiliate account
15  to eBay is fraudulent. Dunning has been paid approximately $7 million for the fraudulent cookie
16  stuffing with his Kessler's eBay affiliate account.

17  //
18  //
19  //
20  //
21  //
22  //
23  //
24  //
25  //
26  //
27  //
28

31